[Crim. No. 1535. In Bank.—November 30, 1910.]

## THE PEOPLE, Respondent, v. LOUIS GLASS, Appellant.

CRIMINAL LAW—BRIBERY OF SAN FRANCISCO SUPERVISOR—PREVENTING FRANCHISE TO RIVAL—INCOMPETENT EVIDENCE—PRIOR FRAUD IN OAKLAND.—Upon the trial of an indictment of the manager of a telephone company for bribery of a San Francisco supervisor to vote against a franchise to a rival company, evidence of action taken by him and his associates, long prior in Oakland to prevent a franchise therein by fraud and trickery, in procuring another franchise to a "bogus company," was incompetent, as having no tendency to prove identity of plan, or the motive of the bribery charged, and its admission was prejudicially erroneous as tending to degrade the character of the defendant in the minds of the jury. [Shaw, J., and Angellotti, J., dissenting.]

ID.—RULE AGAINST EVIDENCE OF DISTINCT ACTS.—The law would not have permitted evidence of distinct acts even to show a former bribery of Oakland supervisors. Not only is the prosecution forbidden to show a former distinct crime, but it is also forbidden to prove former distinct acts short of crime, the tendency of which is only to degrade and prejudice the defendant in the minds of the jury.

ID.—"IDENTITY OF PLAN"—MEANING—PLANS NOT IDENTICAL—DISTINCT EFFORTS.—Identity of plan must mean a desire and effort upon the part of defendant's company to exclude competition in Oakland, and the same desire and effort displayed to exclude competition in San Francisco. But the plans are not identical as the efforts were distinct. In the Oakland transaction there was no effort at crime, while in the San Francisco transaction the contention was that crime and nothing but crime was contemplated and perpetrated.

ID.—MOTIVE OF CRIME NOT IN DOUBT—TENDENCY OF EVIDENCE TO BESMIRCH DEFENDANT.—The motive of the crime in San Francisco not being in doubt, the evidence of Oakland transactions could have no legal effect to prove motive, but such evidence could only tend to besmirch and degrade the defendant in the eyes of the jurors, as having resorted to trickery and fraud to prevent competition.

ID.—RULE AGAINST PREJUDICIAL EVIDENCE.—The rule against prejudicial evidence includes all evidence which would have a tendency to degrade the defendant, to arouse the prejudice of the jury, to divert their minds from the real issues in the case, or to persuade them by matters not judicially cognizable that the defendant for reasons other than those contained in legitimate evidence was more likely to have committed the offense.

ID.—ERROR NOT DEEMED HARMLESS—ACTION OF PROSECUTION IN SECURING VERDICT BY INCOMPETENT EVIDENCE—ESTOPPEL—PRESUMPTION.

—Where the prosecuting attorney, in his zeal to secure a verdict of guilty, has used incompetent evidence, the reply which the law makes to the suggestion that the error should be deemed harmless, is that after injecting it into the case to influence the jury, the prosecution ought not to be heard to say that it was harmless. It must be presumed in favor of the liberty of the citizen that whatever the prosecutor, against defendant's protest, has laid before the jury, helped to make up the weight of the prosecution which resulted in the verdict of guilty.

ID.—INADMISSIBLE EVIDENCE—EMPLOYMENT OF POLITICAL BOSS AS ATTORNEY—NON-ACTION IN BRIBERY ALLEGED—ASSISTANCE TO RIVAL COMPANY.—Mere evidence of the employment of a political boss on salary as attorney for the company represented by the defendant was inadmissible where there is no evidence that he assisted in defendant's bribery of the supervisor, but the evidence shows that his services were actively engaged in behalf of the rival company which was also spending money freely to secure its franchise.

ID.—OBJECT OF EVIDENCE OF SUCH EMPLOYMENT.—The record shows that the evident object of the evidence as to the employment of such political boss as attorney, was to prejudice the jury against the defendant, and to lay the foundation of an argument against his character.

ID.—CHARGE OF BRIBERY OF ONE SUPERVISOR—ADMISSIBLE EVIDENCE OF BRIBERY OF OTHERS—PART EXECUTION OF CONSPIRACY.—Upon a charge of bribery of one supervisor, evidence was admissible to show the payment of money to other supervisors, not for the mere purpose of showing distinct crimes, but as showing that the specific act of bribery charged was but part execution of one conspiracy or scheme which contemplated the bribery of a sufficient number of supervisors to prevent the granting of the rival franchise.

ID.—EVIDENCE FOR LIMITED PURPOSE—PREJUDICIAL REFUSAL OF INSTRUCTIONS LIMITING PURPOSE.—The evidence of payment made to other supervisors could only have been admitted for a limited purpose, and it was prejudicially erroneous for the court to refuse to give requested instructions limiting such purpose, and to give no instruction on that subject. [Sloss, J., Shaw, J., and Angellotti, J., dissenting.]

ID.—PREJUDICIAL REMARKS OF DISTRICT ATTORNEY—REFUSAL OF SELF-INCRIMINATING WITNESS TO TESTIFY.—ERROR NOT SUFFICIENTLY CORRECTED.—Where the district attorney made prejudicial remarks about the refusal of a witness for the prosecution, who was the auditor of the company represented by defendant, to testify for the prosecution, on the ground that his testimony would incriminate himself, by adverse insinuation therefrom against the defendant, it is held that the prejudicial effect of such remarks was not sufficiently removed or corrected by the instructions of the court to disregard the same. [Sloss, J., Shaw, J., and Angellotti, J., dissenting.]

ID.—MOTION IN ARREST OF JUDGMENT—SUFFICIENCY OF INDICTMENT—
WAIVER OF DEFECTS NOT ATTACKED BY DEMURRER.—Upon a motion
in arrest of judgment on the ground of alleged defects in the in-
dictment, since all defects appearing upon the face of the indictment,
save want of jurisdiction of the court over the subject-matter of
the indictment, and that the facts do not constitute a public offense
are waived unless the indictment be attacked for such defects by
demurrer, it is essential that the court should be informed as to
the contents of the demurrer, to determine the sufficiency of the
motion in arrest of judgment.

ID.—DEMURRER NOT INCLUDED IN BILL OF EXCEPTIONS—DIMINUTION OF
RECORD.—Though the demurrer was not included in the bill of ex-
ceptions, yet where a judgment is rendered on conviction the de-
murrer is a part of the record of the case under section 1207 of the
Penal Code, and must be transmitted to the appellate court after
the taking of the appeal, and it is proper to require a certified copy
of it to be sent up to be considered in reviewing the motion in arrest
of judgment.

ID.—CONSTRUCTION OF CODE—"COPY OF MINUTES OF PLEA OR DEMURRER"
—"OR" READ AS "AND."—The words of subdivision 1 of section 1207
of the Penal Code requiring the record of the action to contain:
"1. The indictment or information, and a copy of the minutes of the
plea or demurrer," is not intended to include a "copy of the minutes
of the demurrer," since no such minutes exist. The demurrer is in
writing and is to be considered separately from "the minutes of
the plea," and the word "or" after those words is to be construed
as "and." The demurrer speaks for itself, and is part of the record
of the case.

ID.—SUFFICIENCY OF INDICTMENT—BRIBERY OF SUPERVISOR—LANGUAGE
OF STATUTE—KNOWLEDGE OF MEMBERSHIP OF BOARD.—Although
section 165 of the Penal Code, under which the indictment for
bribing a supervisor is framed, does not expressly require that it
shall state that the defendant knew that the supervisor bribed
was a member of the board of supervisors, and the indictment is
sufficient if it follows the language of the statute; yet the allega-
tion that the bribe was given to the supervisor with "intent in him,
the said Louis Glass, to corruptly influence said Thomas F. Lonergan
as such member of said board of supervisors, in his action, and in
his official vote, opinion, judgment and action, as such member of
said board of supervisors," necessarily carries with it the fact of
the knowledge of Glass that Lonergan was a member of said board.

ID.—UNLAWFUL INFLUENCE.—Where the indictment alleges that the
bribe was given "with the willful, unlawful, felonious and corrupt"
intent" of defendant "to corruptly influence" the supervisor, "as such
member of said board of supervisors," etc., it sufficiently charges that
the bribe was given to influence *unlawfully* said supervisor "as such
member of said board." It is inconceivable that any officer may

be corruptly influenced in his official action by giving to him money, without unlawfully influencing him.

ID.—DEFINITION OF "BRIBE."—The term "bribe" is not defined in section 165 of the Penal Code, describing the offense charged, but is defined in section 7 of that code, as signifying "anything of value or advantage present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his action, vote, or opinion, in any public or official capacity."

ID.—CERTAINTY OF INDICTMENT AS TO MATTER PENDING BEFORE BOARD OF SUPERVISORS—APPLICATION FOR TELEPHONE FRANCHISE.—The indictment is sufficiently certain to enable any person of common understanding to know the matter pending on which the bribe was given was the matter of an application for the granting of a franchise to the Home Telephone Company of San Francisco, for constructing, maintaining, and operating a telephone system in the city and county of San Francisco, and that the bribe was given to a supervisor to influence his vote on said matter.

ID.—JUDICIAL NOTICE OF POWER OF SUPERVISORS.—This court knows, as matter of law, that the board of supervisors of the city and county of San Francisco has jurisdiction to grant franchises to maintain and operate telephone systems in said city and county, and that a vote of a member of said board on an application therefor, would necessarily be an official act.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from an order denying a new trial. William P. Lawlor, Judge.

The facts are stated in the opinion of the court.

D. M. Delmas, T. C. Coogan, H. C. McPike, and C. W. Cross, for Appellant.

U. S. Webb, Attorney-General, W. H. Langdon, District Attorney, Francis J. Heney, Assistant District Attorney, John O'Gara, Assistant District Attorney, and Wm. Hoff Cook, Assistant District Attorney, for Respondent.

HENSHAW, J.—A hearing before this court was granted from the decision rendered by the court of appeals of the first appellate district. Upon due consideration we adopt the opinion and views of the court of appeal, saving upon two propositions which will hereinafter be noted.

Amplification of certain of the propositions discussed and

decided by the court of appeal is called for in answer to the considerations pressed upon this court in the petition for rehearing.

1. A vast mass of evidence was introduced in this case which, for brevity, may be designated evidence touching the Oakland franchise. Admittedly, the transactions covered by this evidence, in point of time, long antedated any of the occurrences properly embraced within the charge of bribery. Admittedly, also, the transactions were entirely separate and distinct, the earlier one having no causal connection with the latter. By the Oakland evidence it was sought to be shown that the telephone company, with which defendant, Glass, was connected, in an endeavor to prevent competition in the city of Oakland and to exclude from that territory the Home Telephone Company, its competitor, and an applicant for a franchise, had itself, through a third person—"a dummy"— secured a franchise, and had aided and abetted in the organization of a corporation which did not enter the field of competition and was not designed to enter the field of competition, but was organized and kept in existence for the purpose of holding the franchise and raising objection to the issuance of a third franchise to the Home Telephone Company, upon the ground that two companies were already in the field and that it was useless and injurious to them that a franchise should be issued to a third corporation. Most of what was done in this regard was done not by Mr. Glass but by Mr. Sabin, the then president of the company. To the repeated objections of the defendant's counsel to the introduction of this vast mass of testimony, the only reason assigned by the court for its admission is found in the statement that "it (the evidence) was all addressed to the question of the activities of this defendant in the corporation during the period that is material here." This language lacks in lucidity much to be desired. The only "activities" of the defendant which could be legitimately inquired into under this charge of bribery were activities having a bearing thereon and a connection therewith. The only "period that is material here" is the period from the formation of the alleged conspiracy to bribe the San Francisco supervisors down to and including the criminal accomplishment of the conspiracy upon which this charge of felony is based. It should seem unnecessary to state—but apparently

it is not—that a multitude of acts, facts, and happenings upon
which men base their opinions and judgments of their fellow-
men do not come within the definition and scope of *evidence* as
known to our law. If a man is informed, and believes his in-
formant, that another man is dissolute, is a gambler, is an
associate of known thieves, is a petty larcenist, and makes his
home in a house of prostitution, he will justly look upon such
a person with suspicion, will properly govern his dealings and
relations with that person by this information, and would
most naturally say, if he learned that the man had been ar-
rested for burglary, that "it was to be expected." Yet, upon
the trial of that man for burglary, no word of these matters
would be admissible against him. Not because they would
not have a tendency to show that a man of such character
would be much more likely to commit the given offense than
would a man of proven upright and honorable life, but be-
cause the law, for reasons good and sufficient unto itself, has
declared that a man shall be put upon trial for but one offense,
and that he shall not be embarrassed by being called upon to
defend or exculpate himself, or to explain any damaging act
or fact which is not embraced within the charge he is called
upon to meet. The law will not even permit a defendant's
reputation to be assailed unless he shall himself have made
that reputation an issue in the case. This, perhaps undue,
tenderness goes to the extent that his guilt of petty offenses
may not even be shown, and in his impeachment it may be
established against him only that he has been previously con-
victed of a felony. It would, no doubt, have made most potently
against this defendant in the minds of the jurors if, for ex-
ample, it could have been shown that in this separate and dis-
tinct Oakland transaction he had bribed the councilmen there.
But no one has been bold enough to assert that such evidence
would be admissible, and the decisions of every court, includ-
ing our own, are against its admissibility. Not only is the
prosecution thus forbidden to prove another crime, but, the
law does not sanction the introduction of evidence falling short
of crime and designed merely to degrade and prejudice the
defendant in the minds of the jury. (*Commonwealth* v.
*Jackson,* 132 Mass. 16; *People* v. *Molineux,* 168 N. Y. 264,
[61 N. E. 286].) As has been said, the language of the court
holding that it was permissible to show "the activities of the

defendant during the period that is material here" is not illuminating, nor is it adopted by the people in their briefs. By the people it is contended: 1. That the evidence is admissible as showing identity of plan; 2. As showing motive, and, 3. If inadmissible, still, as the evidence did not tend to prove any other crime against the defendant, its admission was without injury. The People's brief declares it to be admissible as showing "identity *and* plan." We construe this to mean identity *of* plan, because, of course, the identity of the defendant was never for a moment in question. Identity of plan must mean a desire and effort upon the part of the Pacific States Telephone and Telegraph Company to exclude competition in Oakland, and the same desire and effort displayed to exclude competition in San Francisco. But indisputably there was no identity of plan. It is not contended that in any of the Oakland transactions any crime was committed, while the contention is that in the San Francisco transaction crime, and nothing but crime, was contemplated and perpetrated. As to the second reason assigned, that of motive, there never was any doubt, never any question, never any suggestion from any source whatsoever, but that if this crime was committed, it was committed for the sole and single purpose of preventing competition. Indeed, the uncontradicted evidence of the supervisors, if direct evidence upon so plain a proposition was needed, was all to this effect. A boy of ten years might justly be regarded as gravely deficient in intellect who would need any enlightenment upon so plain a proposition. In fact, so far from the question of the motive ever having been in doubt, it would call for the acutest ingenuity to conceive of any other motive than this most obvious one. Yet, nevertheless, it is said that this vast mass of evidence, dealing with transactions wholly detached in time and place, is admissible as establishing the motive which prompted the defendant to commit an alleged crime, separate and distinct from the Oakland transactions in time, in place, and in methods. The real reason why the evidence was offered is most obvious. It was not offered to show motive. It was not offered to show identity and plan or identity of plan. These are the veriest pretenses. It was designed to besmirch and degrade the defendant and to be made use of in argument, to show that the defendant had gone to the length of organizing

a fraudulent corporation, and by secret device and artful chicane had endeavored to prevent honest competition; that the defendant had gone to the border line of crime in the Oakland transaction and found, that stopping there, his efforts to prevent competition were without success. What more natural, therefore, than that when the same problem arose in San Francisco, the defendant, finding even the efforts of fraud and trickery unavailable, should have stepped over the line and become a law-breaker and a criminal? Such, we say, was the obvious purpose for which the evidence was introduced, and this the briefs of the People here on file establish. For in those briefs, while endeavoring to support the admissibility of the evidence on the grounds above stated, it is said that if "the evidence also casts suspicion on defendant he cannot be heard to complain." In the history of the transactions Glass is charged with having organized this "bogus" company. There is described the policy of the Pacific States Telephone and Telegraph Company employing political bosses and paying salaries to supervisors. It is directly stated that "the history of the contest waged against the Home Company in Oakland shows so clearly Glass's activity in his company's behalf; . . . these and many other circumstances lead irresistibly to the conclusion that Louis Glass, vice-president, acting president, and general manager of the Pacific States Telephone and Telegraph Company, aided, abetted, advised, directed and encouraged Halsey to pay the bribe to Lonergan." And, finally, again, quoting from the People's brief it is said: "To Glass, this experience in Oakland must have taught a bitter lesson. For one thing, Beasly's 'bogus' company had proved a losing investment—no small consideration, for the executive committee had listened very reluctantly when Glass had personally pleaded for its succor. But the lesson stamped indelibly on his mind must have been that the Home Telephone Company could not be kept out of San Francisco except by drastic measures." That this evidence was potent for the purpose of degrading the defendant in the eyes of the jurors will at once be conceded. That it had a tendency to inflame the mind of the jurors against the defendant by showing that in the past he had resorted to the arts of trickery and fraud to prevent honest competition, is quite apparent. That men in the every day affairs of life would have been influenced by

CLVIII Cal.—42

such evidence is unquestionably true. But these things go to establish merely the wrong which its admission worked upon the defendant, and not its admissibility. It was not admissible. Clearly, in the everyday affairs of life, if it should be established to the satisfaction of a jury that upon another and distinct occasion a defendant had offered or solicited a bribe, it would have great weight with them in determining whether in the instance charged he had been guilty of the offense. It would establish, at least, that he was the sort of man who would be willing to do this criminal act. Such was the line of reason and argument here employed. Yet such matters are never legal evidence. In discussing precisely such a case, where evidence had been admitted against the defendant charged with bribery, of a former act of like character, the court of appeals of New York says: "The mental ability and disposition of the defendant to commit a crime of this sort, while it might persuade a jury, raises no legal presumption. . . . Yet the inference drawn by the prosecuting officer, and permitted by the court, left it for the jury to say that the desire of Sharp, manifested by the offer of a bribe in one instance, was the same desire which led to the actual giving of a bribe in the other; hence that the two crimes had the same origin. . . . It was put in near the beginning of the trial, and the impression then made must have continued with the jury, and in their minds colored and deepened, if it did not distort, the subsequent evidence. It did indeed cast a dark shadow upon the defendant's character. It not only tended very strongly to prove the defendant guilty; it was absolute proof, but it was of a different crime from that charged. It was offered and received directly on the main issue, and was of great and persuasive force against him. Such evidence is uniformly condemned, as tending to draw away the minds of the jurors from the real point on which their verdict is sought, and to excite prejudice, and to mislead them. It was improperly received, and the exception to its admission well taken." (*People* v. *Sharp,* 107 N. Y. 427, [1 Am. St. Rep. 851, 14 N. E. 319].)

Of the third proposition that the evidence, even if erroneously admitted, was without prejudice to the defendant, the argument of the People adverted to in their brief should be sufficient to show the untenableness. But, moreover, the rule

does not limit the exclusion of such evidence only to transactions which amount to crime. It includes all evidence which, as here, would have a tendency to degrade the defendant, to arouse the prejudice of the jury, to divert their minds from the real issues in the case, or to persuade them by matters not judicially cognizable, that the defendant, for reasons other than those contained in legitimate evidence was more likely to have committed the offense. (*People* v. *Molineux*, 168 N. Y. 264, [61 N. E. 286].) Quite apposite in this connection is the following language of the circuit court of the United States in *Miller* v. *Territory of Oklahoma*, 149 Fed. 330, [79 C. C. A. 268]: "The foregoing incident strikingly illustrates where the responsibility for the miscarriage of justice in criminal prosecutions should sometimes be placed, instead of imputing the reversal of convictions by the appellate courts to what is properly termed 'mere technicalities.' The zeal, unrestrained by legal barriers, of some prosecuting attorneys, tempts to an insistence upon the admission of incompetent evidence, or getting before the jury some extraneous facts supposed to be helpful in securing a verdict of guilty, where they have prestige enough to induce the trial court to give them latitude. When the error is exposed on appeal, it is met with the stereotyped argument that it is not apparent it in anywise influenced the minds of the jury. The reply the law makes to such suggestion is: that, after injecting it into the case to influence the jury, the prosecutor ought not to be heard to say, after he has secured a conviction, it was harmless. As the appellate court has not insight into the deliberations of the jury-room, the presumption is to be indulged, in favor of the liberty of the citizen, that whatever the prosecutor, against the protest of the defendant, has laid before the jury, helped to make up the weight of the prosecution which resulted in the verdict of guilty."

2. Upon the question of the admissibility of the testimony touching the employment of Ruef and the salary paid to him by the company of which defendant was manager, the court of appeal goes no further than to hold that the prosecution "had the right to contend that from the conversation testified to by Mr. Pillsbury the defendant was responsible for the employment of Ruef." It does not, however, saving in this inferential way, discuss or pass upon the admissibility of the

evidence itself. It was clearly inadmissible, and the purpose of its offer was, of course, identical with the offer of the Oakland testimony—to degrade the defendant and prejudice him in the eyes of the jury. By the people it is argued that the evidence was admissible because "the defendant was the first to make Abraham Ruef a circumstance in the case"; that "the evidence was therefore admissible as tending to show preparation." It is further stated that the evidence was admissible because it tended to show a connection between Halsey and Glass, and, finally, that it was admissible as tending to show the motive of the defendant in the bribery of Lonergan. "Ruef, being the boss of the board of supervisors, and the application of the Home Telephone Company being before the board, it is not believable that the desire of defeating that ordinance did not enter into the payment of that large salary to Ruef." But it is not contended even by the prosecution that Ruef was in any way employed in the bribery of the supervisors, or that the salary was paid to him for any such purpose. Not only is this so, but it is affirmatively made to appear that Ruef opposed the desires of the Pacific States Telephone and Telegraph Company and was actively instrumental in seeing that its rival, the Home Telephone Company, secured its franchise. Thus, it is said in respondent's brief: "It must have been clear to any observer, long before the caucus, that Ruef, despite his liberal monthly salary, was not favorable to the Pacific States. It seems from the record that the Home Telephone Company also spent money very freely."

It being therefore in evidence, and, indeed, asserted by the prosecution that Ruef was not employed by defendant in furtherance of the conspiracy to bribe the supervisors, that he took no part in the matter of their bribery, that his services were actively enlisted on behalf of the opposition company, what of bearing upon this case could this evidence of his employment establish, what could have been its purpose other than as has been said, the purpose of degrading defendant and inflaming the minds of the jurors against him? The reasons assigned for the admissibility of this evidence were without substantiality. Respondent asserts that the evidence was admissible because "defendant was the first to make Abraham Ruef a circumstance in this case." All that there is in this regard is that in the cross-examination of one of the Peo-

ple's witnesses, supervisor Boxton, his testimony appears to the following effect: "The Republican boss of the board, Boss Ruef, and James L. Gallagher distributed money to the members of the board, a certain gratuity, with reference to the passage of that ordinance." The ordinance here referred to had nothing to do with telephone matters. It scarcely merits the reply that such a statement elicited upon cross-examination of a witness for the People is no justification for the introduction of the evidence to show that "Boss Ruef" was employed by defendant's company, and inferentially by defendant upon matters and things wholly disconnected with the charge under investigation. Nor can it be perceived why the evidence was admissible as tending to show any connection between Halsey and Glass, nor how it can show such connection. As to its being admissible to show the "motive of the defendant in the bribery of Lonergan," as has been said, it was never contended by the People that Ruef was employed by the defendant or by his company to bribe these officers, or that he took any part in such bribery, and how, therefore, evidence of the employment of Ruef could by any possibility show "the motive of defendant in the bribery of Lonergan" cannot be comprehended. The record itself, however, resolves all these questions and establishes that the real purpose was that indicated. When objection was made to the introduction of this evidence the following colloquy took place:—

The Court: "What is the purpose of that, Mr. Heney?

Mr. Heney: "The purpose is to show that Mr. Glass informed this witness that Abraham Ruef was employed by the company during that period of time."

Here was the purpose of the offer, stated in simple and direct terms. It was to show the employment under the indicated circumstances as the "foundation of an argument" against the character of Glass, and to prejudice the jury against him by showing that he had taken Ruef into the employ of the company.

3. Under objections and exceptions of defendant, evidence was introduced of the bribery and the payment of moneys by Halsey to certain other supervisors. This evidence as to each of these transactions was admittedly evidence of a separate and distinct crime. It is so declared by the respondent. It was admissible, as contended for by respondent, and as dis-

cussed in the opinion of the court of appeal, not as proving separate and distinct crimes, but as showing that the specific act of bribery charged was but a part execution of one conspiracy, a scheme which contemplated the bribery of a sufficient number of supervisors to prevent the granting of the franchise. Indisputably the evidence was not admissible generally, nor was it admissible to show that the defendant probably committed the crime with which he was charged, by showing that at other times he had committed like crimes. The court itself upon this evidence declared as follows: "Evidence of alleged payments to other supervisors received as tending to show identity of plan and motive and to trace the alleged bribe fund of fifty thousand dollars, of which the five thousand dollar bribe alleged in the indictment herein was claimed to be a part." The reasons thus given are sound in point of law. They themselves establish that the evidence was before the jury for consideration for these limited purposes only. Being before the jury for these limited purposes, the evidence was of course not before the jury for any other purpose. Yet, when defendant proposed instructions directing the jury as to the limits within which the evidence could be considered by them, one and all, the court refused these instructions. The first was in the following language: "It is not proper to show that the defendant was guilty of some other offense, for the purpose of raising a presumption, either of law or of fact, of his guilt in the case under consideration." The court refused to give this instruction upon the ground that it was "not justified by the evidence; no evidence received for such purpose." The instruction is unimpeachable in point of law. It is the exact language of this court in *People* v. *Sears,* 119 Cal. 267, [51 Pac. 325]. The evidence, though admissible for but the limited purpose indicated, was by the court admitted generally. It was most proper, therefore, for the defendant's counsel to seek to have the jury instructed as to the sole purpose or purposes for which it could be considered. One of the purposes for which it could not be considered was undoubtedly the purpose embraced in the instruction. And yet the court refused to give it solely on the ground that, in its own mind, it had not received the evidence for that purpose. But how, unless the court informed the jury that it had not received it for that purpose, was the jury to know

that it was not to be considered for that purpose? Surely, when the court confines its ruling to a general declaration that "the objection is overruled," the jury is not in a position to know, unless informed in terms by the court, that it is not to consider the evidence generally. Neither jury nor counsel thus being enlightened by the court as to the purpose for which it considered the evidence admissible, defendant's counsel proposed several other instructions upon the same subject. For instance, the following: "Testimony has been introduced by the prosecution which it is claimed tends to show the commission of other acts or offenses by the defendant similar to those charged in the indictment. I charge you that this evidence was admitted for the sole purpose of proving guilty intent, motive, or guilty knowledge of the defendant, and that it can be considered by you for no other purpose." This instruction was refused by the court under its statement that "it was not warranted by any claim, theory or evidence presented during the trial as to other offenses. Evidence not so limited or admitted to prove guilty intent." And yet, when we turn to the brief of the People, we find vigorous argument that the evidence was offered and was properly admitted to prove motive and guilty intent. In various other ways counsel for defendant, left groping in the dark, endeavored by pertinent instructions to have the court limit the consideration of this evidence of other crimes to specific purposes. One and all the court refused to give these instructions, and of its own initiative gave no instruction whatsoever limiting the purpose for which the evidence should be considered by the jury, notwithstanding that the court by its indorsement on the refused instructions declared that it was received only as tending to show identity of plan and motive and to trace the alleged bribe fund of $50,000. On this appeal it is not contended that evidence of the other crimes was generally admissible to prove the crime charged, but the People rest upon the proposition that the refusal of the first instruction quoted was justified because it was upon a "mere abstract question of law" and that the refusal to give the other instructions was justified "because the evidence was not admitted for the sole purpose of proving guilty intent, motive or guilty knowledge," but was admitted "also to show a single design, purpose and plan, and to identify and connect the defendant with the bribery of

Lonergan by means of the fifty-thousand-dollar bribe fund."
As has been said, defendant's counsel could not know, and
were not able to find out the specific purposes for which the
court admitted the evidence, since it was by the court admitted
generally. The court alone knew the limited purposes which,
in its own mind, it believed justified the admission of the evi-
dence. It became the plain duty of the court under these
circumstances to have instructed the jury and to have limited
its consideration of the evidence to these specific purposes, and
this duty became the more imperative when defendant's
counsel were seeking, with all the knowledge they possessed,
to have the consideration of the evidence so properly limited.
"When the evidence of other crimes is admitted, it should be
carefully limited and guarded by instructions to the jury, so
that its operation and effect may be confined to the legitimate
purposes for which it is competent." (12 Cyc. 631.) In
*Commonwealth* v. *Shepard*, 1 Allen, (Mass.) 575, Bigelow,
chief justice, says, speaking upon the admission of evidence
of other offenses: "It is a dangerous species of evidence not
only because it requires a defendant to meet and explain other
acts than those charged against him and for which he is on
trial, but also because it may lead the jury to violate the great
principle that a party is not to be convicted of one crime by
proof that he is guilty of another. For this reason it is essen-
tial to the rights of the accused that when such evidence is
admitted it should be carefully limited and guarded by in-
structions to the jury so that its operation and effect may be
confined to the single and legitimate purpose for which it is
competent." In our state, in *People* v. *Cook*, 148 Cal. 334,
[83 Pac. 43], it is said: "It was of the highest importance to
the defendant in this case, as it always is to any defendant in
any case in which evidence of a distinct offense has been ad-
mitted for the purpose of showing motive to commit the crime
charged that the jury should be cautioned not to consider such
evidence for any but the limited purpose for which it has been
admitted, and we cannot see that the instruction as presented
contained a single word beyond what the defendant had a
right to request. The court, however, refused the instruction,
and its refusal is justified on the ground that another instruc-
tion framed by the judge on the same point was given. It is
true that the instruction given stated the law correctly; but it

was brief, general, and colorless in comparison with the instruction asked, and had the effect of minimizing the importance of a consideration which could not have been stated with too much emphasis. This instruction as asked should have been given." The distinction between the Cook case and the case at bar is that in the Cook case the court did give an instruction, though it was characterized by this court as being "brief, general and colorless." In the case at bar the court refused to instruct the jury upon the subject at all.

4. In addition to what the court of appeal says in its discussion touching the error of the trial court in refusing to give instructions proposed by defendant, to the effect that the jury had no right to indulge in any presumption or inference unfavorable to the defendant because of the refusal of any witness to testify, or the failure of any witness to testify for the prosecution, it is to be borne in mind that the argument of the prosecuting attorney against the defendant for the refusal of Zimmer to testify, contained not only a severe arraignment of the defendant, but implication and insinuation that the testimony if given would have been unfavorable to the defendant. The method which the defendant's counsel took to set the jury right upon this matter was the approved method of proposing timely instructions to the jury to disregard the objectionable remarks. (*Johnson* v. *Union Pacific R. R. Co.,* 35 Utah, 285, [100 Pac. 390].) It will be remembered that Zimmer refused to testify upon the ground that his testimony would incriminate, not Glass, but himself. Says the supreme court of the United States: "No inference should have been permitted to be drawn against the defendant because of the assertion by the witness of this right to protect himself. He was called by the government. If he had testified, his testimony might have been in favor of the defendant, though criminating himself. It might have entirely exonerated the defendant. To infer that the very opposite would have been or might have been the effect of his testimony, had it been given, was unwarranted." (*Beach* v. *United States,* 46 Fed. 754.) That the principles of law contained in the proposed instructions were unimpeachable, is not questioned. In justification or excuse of the court's refusal, it is said only that injury was not worked to the defendant, because the substance of the instructions was contained in instructions which

the court actually gave. But when reference is had to these instructions, the giving of which it is asserted saves the error, it is found that they amount to no more than this, that in varying form the jury is told that it is to consider only the evidence in the case, and is not to consider evidence which has been excluded or ordered stricken out by the court, and that the jury is cautioned to distinguish carefully between the facts testified to by the witnesses and the statements made by counsel as to what facts have been proved. It is inconceivable that any one can assert that such colorless and characterless instructions containing no direct reference to this subject, · meet a case where the attorney for the people has been arguing, in violation of the law, as to what the witness would have testified to, if he had testified, and that the testimony would have been hostile to the defendant. If this, indeed, be the rule, then all antecedent authority and precedent must be cast aside, and notwithstanding the mandatory declaration of the code that judges must instruct the jury on all pertinent matters of law, when requested so to do, and notwithstanding the concession here made that these were pertinent and important principles of law, it will suffice in the future to say that if the judge tells the jury that they are to consider the evidence, and only the evidence, admitted in the case, his full duty to a defendant has been performed. Let one instance of the working of such a rule as is here contended for suffice. The defendant exercising his constitutional right does not testify in his own behalf. The prosecuting officer argues vehemently that he fails to take the witness stand because he knows he is guilty, and that if he did take the witness stand, on crossexamination he would prove that he was guilty, and that the jury is therefore justified in finding him guilty, from the fact that he has failed to testify. Defendant's counsel proposes an instruction to the effect that no inference adverse to the defendant is to be drawn from his failure to testify. The court refuses to give this instruction, and this court, following the rule here contended for, would have to hold that the instruction of the court to the jury that it was to consider only the evidence adduced in the case embraced the matter of the proposed rejected instruction, and was therefore all that the defendant was entitled to. If justification for the court's refusal may be found in the one case, it may

equally be found in the other. The illustration is no more extreme than is the matter at bar.

For these reasons, in addition to those given in the opinion of the court of appeal, the judgment and order are reversed and the cause remanded.

Melvin, J., and Lorigan, J., concurred.

BEATTY, C. J., concurring.—I concur in the judgment of reversal and in most particulars in the opinion of Justice Henshaw. I shall, if other pressing duties permit, present my views in a separate opinion.

SLOSS, J., concurring.—I concur in the judgment of reversal upon the ground, solely, that the court erred in admitting testimony concerning the Oakland transactions in 1902. This testimony relates to matters extraneous and collateral to the main charge, and having, so far as I am able to see, no reasonably direct tendency to show the commission by the defendant of the offense charged, or a motive on his part for its commission. Nor can it be said that this testimony, if its admission was error, did not harm the defendant. Even though his conduct with regard to the Oakland franchise did not constitute a crime, it included acts which might well be regarded as discreditable. The natural effect of such testimony would be to prejudice his case in the minds of the jury.

On each of the other points discussed in the opinion of Mr. Justice Henshaw, I agree with the dissenting members of the court that no prejudicial error was committed.

SHAW, J., dissenting.—I dissent from the judgment of reversal.

The evidence of the conversation between Pillsbury and Glass showed the familiarity of the latter with the inside doings of the company and was competent for that purpose, as was fully shown in Justice Hall's opinion. The evidence of the bribery of the other supervisors, as Justice Hall shows, tended directly to prove the giving of money to Lonergan, which was the specific crime charged. This takes it out of the rule requiring cautionary instructions as to evidence admitted for a limited purpose. The refusal to instruct specially

as to the Zimmer episode was fully covered by the instructions given. Any intelligent juror would know therefrom that Zimmer's refusal to testify could not be considered. The misconduct and ulterior purposes of counsel for the prosecution, about which so much is said, are foreign to the case, so far as this court is concerned. Misconduct is not assigned as error.

With regard to the Oakland franchise, a mass of evidence was given concerning the previous course of the Pacific States Telephone and Telegraph Company toward the rival concern. Large *quasi* public corporations operating over an entire state are more like governmental bodies than like natural persons. They act in accordance with fixed, permanent rules and orders, akin to laws. Their methods cannot be judged by the same standards as those of individuals. The evidence as to the Oakland matters showed a settled policy and design by said company to vigorously oppose the competing company at all points, justifying an inference that there were rules and orders to that effect which its officers were·expected to follow. Glass must have been aware of this, and it would naturally incite him to more than ordinary zeal in endeavoring to stamp out the beginnings of competition in his own company's most valuable territory, the city of San Francisco. It had a direct legal tendency to prove the motive to bribe the supervisors, if he was willing to resort to such practices, and it was admissible for that purpose. The fact that such motive would be obvious would not render proof of it incompetent.

Angellotti, J., concurred in the opinion of Justice Shaw.

The following is the opinion of the district court of appeal of the first district, above approved, rendered on April 14, 1909:

HALL, J.—Defendant was charged by indictment with the crime of bribery, under section 165 of the Penal Code, and having been convicted of the charge he has appealed to this court from the judgment and the order denying his motion for a new trial. After his conviction, and before judgment was pronounced, the defendant made a motion in arrest of judgment, which was by the court denied. As this motion

attacked the sufficiency of the indictment it is proper that the ruling of the court thereon be first considered on this appeal.

The motion was based upon certain defects or alleged defects in the indictment. In this connection it is insisted by respondent that in the condition of the record in this case, this court can only consider whether or not the court had jurisdiction over the subject-matter of the indictment, and whether or not the indictment states facts sufficient to constitute a public offense (Pen. Code, secs. 1012 and 1185). No demurrer is contained in the bill of exceptions, and the transcript as originally filed in this court did not, in the judgment-roll, or "record of the action," as it is denominated in the statute (Pen. Code. sec. 1207) contain the demurrer.

Upon suggestion of diminution of the record, this court permitted appellant to file a certified copy of the demurrer, reserving, however, for determination at the final hearing, the question as to whether or not such demurrer may be properly considered as a part of the record on this appeal.

All defects appearing upon the face of the indictment, save want of jurisdiction of the court over the subject-matter of the indictment, and that the facts stated do not constitute a public offense, are waived unless the indictment be attacked for such defects, by demurrer (Pen. Code, sec. 1012).

Defects, waived by failure to demur, cannot be made a ground for arrest of judgment, but the same objections that may be raised by demurrer may also be raised on motion in arrest of judgment, if not waived by a failure to demur (sec. 1185).

It is thus apparent that it is important for this court to be informed as to the contents of the demurrer, in order to determine whether or not the court erred in overruling the motion in arrest of judgment. The proper scope of the motion depends upon what objections were raised by the demurrer.

Respondent contends that the demurrer is no part of the record on appeal, and cannot be considered by this court unless contained in a bill of exceptions, citing *People* v. *Long,* 121 Cal. 494, [53 Pac. 1097]; *People* v. *Druffel,* 3 Cal. App. 731, [86 Pac. 907], and sections 1172 and 1174 of the Penal Code.

On the other hand, appellant insists that the cases cited have no application to a case where a judgment on conviction

is rendered, and that under section 1207 of the Penal Code, the demurrer in such case is a part of the record of the case, and as such must be transmitted to the appellate court after the taking of the appeal (Pen. Code, sec. 1246).

In *People* v. *Long*, 121 Cal. 494, [53 Pac. 1097], the appeal was by the people from an order sustaining defendant's demurrer, and ordering that the case be resubmitted to the grand jury. There had been no judgment of conviction rendered, and the court pointed out that the minute entry of the order sustaining a demurrer could get into and become a part of the record on appeal only by virtue of section 1207. The court simply held that where there has been no judgment of conviction "the statute does not provide for a *judgment-roll or a record of any kind,* except through a bill of exceptions." (Italics are ours.) The court did not attempt to determine in the Long case what shall constitute the "record of the case," or the "judgment-roll," as it is usually called by the profession, when a judgment of conviction has been rendered.

The case of *People* v. *Druffel*, 3 Cal. App. 731, [86 Pac. 907], decided by this court, was, like the Long case, an appeal by the People upon demurrer sustained, and perforce this court simply followed the doctrine of the Long case.

On the other hand, *People* v. *McPherson*, 6 Cal. App. 266, [91 Pac. 1098], was an appeal by defendant after judgment rendered on a conviction, and the court there pointed out that the doctrine of *People* v. *Long*, 121 Cal. 494, [53 Pac. 1097], has no application to such a case, and proceeded to examine and pass upon the ruling upon the demurrer, although the same was not contained in any bill of exceptions, but appeared in the judgment-roll only.

Section 1207 of the Penal Code provides that "When judgment upon a conviction is rendered, the clerk must enter the same in the minutes, . . . and must, within five days, annex together and file the following papers, which constitute a record of the action:

"1. The indictment or information, and a copy of the minutes of the plea or demurrer;

"2. A copy of the minutes of the trial;

"3. The written instructions given, modified, or refused, with the indorsements thereon, and the certified transcript of the charge of the court; and,

"4. A copy of the judgment."

It is the meaning of the language of subdivision 1 that is involved in this matter. It is contended by respondent that the word "demurrer" should be read as qualified by "a copy of the minutes of the." In other words, that the subdivision may be properly paraphrased thus: "The indictment or information, and a copy of the minutes of the plea or (and) a copy of the minutes of the demurrer."

It may be that this meaning does conform most nearly to the strict grammatical construction of the clause, and yet we do not think it correctly gives the meaning of the clause as intended by the legislature. It is perfectly obvious, we think, that the word "and" must be substituted for the word "or." It is hardly conceivable that the legislature intended to invest a clerk, a ministerial officer of the court, with a discretion to select either a copy of the minutes of the plea, or a copy of the minutes of the demurrer," as making a part of the record of the action. And yet this conforms strictly to the grammatical construction of the clause. "And" must be substituted for "or." What is meant by the word "demurrer," and by what, if any, words it is qualified, must be determined by the entire section, read in the light of its manifest purpose, and other provisions of the law bearing upon the subject.

The primary purpose of this section is evidently to cause to be annexed together, and thus preserved in the form of a judgment-roll, such papers as shall show what issues were presented for determination, and the result of such determination. The first pleading in a criminal action, brought in the superior court, is the *indictment* or *information,* which must be in writing. The original indictment, under section 1207 of the Penal Code, clearly becomes part of the judgment-roll. The next pleading is the demurrer, and this also must be in writing. The demurrer must be in writing and filed (Pen. Code, sec. 1005). Strictly speaking, there is no such thing as a minute of the demurrer. It speaks for itself. Doubtless the clerk must enter in his minutes the fact of its presentation and filing and the action of the court thereon (Pen. Code, sec. 1007). But none of these minute entries can in strictness be properly called a minute of the demurrer.

The next pleading is the "plea," and may be of four kinds (Pen. Code, sec. 1016), and is not in writing, but must be

oral, and entered upon the minutes of the court in certain prescribed forms (Pen. Code, sec. 1017). The form of each plea that may be made to an indictment being given by the statute, the clerk can have no difficulty in making the proper minute entries. The pleas being oral, the only way they can become a part of the judgment-roll is by putting into the judgment-roll a copy of such minutes. These in connection with the indictment or information, show what issues of fact were presented for determination.

On the other hand, as the demurrer, like the indictment, must be in writing and filed with the clerk, there is no reason why it may not be, like the original indictment, put into the judgment-roll as an original document, and thus, in connection with the indictment, show what issues of law were presented for determination.

We think that such is the meaning and purpose of the section under discussion. To so hold does not entail any great departure from the strict grammatical meaning of the language employed, and produces a result reasonable and consistent with the manifest purpose of the section read as a whole. Certain it is that when the legislature provided that the clerk should annex together and file "the indictment or information, and a copy of the minutes of the plea or (and) demurrer," it intended that some document relating to the demurrer should be annexed and filed as a part of the judgment-roll. It could not have meant "a copy of the minutes of" the demurrer, for, as we have seen, the law makes no provision for any minutes of the demurrer. There are minutes of the plea expressly required to be entered, but there are, properly speaking, no minutes of the demurrer provided for. The demurrer must, like the indictment, be in writing and filed. The minute entry of the action of the court allowing or disallowing the demurrer (Pen. Code, sec. 1007) is in no proper sense a minute of the demurrer.

While the legislative purpose is clumsily expressed, we are satisfied that it is sufficiently clear that the record of the action, or judgment-roll, as it is commonly called, should contain the indictment or information, the demurrer, and a copy of the minutes of the plea, together with the other papers provided for in subdivisions 2, 3, and 4 of section 1207 of the Penal Code. To read the word "demurrer" in section 1207

as qualified by "a copy of the minutes of the" would be to convict the legislature of requiring the clerk to put something into the judgment-roll that has no existence under the law; for, as we have before said, there can be no "minutes of the demurrer." There may, however, be a demurrer, and it is this that the law intends shall be annexed to the indictment, and form a part of the record of the action.

We do not think there is anything in sections 1172, 1173, and 1174 of the Penal Code, that militates against the conclusion we have reached as to the scope of section 1207 of the Penal Code.

Sections 1172 and 1173 enumerate seven classes of decisions of the court to which exceptions may be reserved, among which are the decisions of the court in allowing or disallowing a demurrer, or in granting or refusing a motion in arrest of judgment. Section 1174 fixes the time and the procedure for the settlement of a bill of exceptions upon any of these decisions, but throws no light upon what matters become a part of the "record of the case" without being included in the bill of exceptions. This is provided for by section 1207, under which, as we have shown, the indictment, the demurrer, and the plea, as set forth in the copy of the minutes of the plea, are a part of the record of the case.

This brings us to the consideration of the action of the court in denying defendant's motion in arrest of judgment. This motion is set forth in the bill of exceptions, and was based upon the same objections to the indictment as were made by the demurrer appearing in the judgment-roll. It thus appears that none of the objections raised on the motion had been waived by a failure to raise such objections by demurrer. (Pen. Code, sec. 1185.)

The indictment is framed under section 165 of the Penal Code, and, omitting the formal parts, is as follows: "That on the 15th day of March, A. D. 1906, one Thomas F. Lonergan was, and at all times herein mentioned has been, a duly elected, qualified and acting member of the board of supervisors of the said city and county of San Francisco, state of California; that there was then and there pending before the said board of supervisors a matter and subject relating to a franchise for constructing, maintaining and operating a telephone system in the said city and county of San Francisco,

and an application made June 12th, 1905, by the Home Telephone Company of San Francisco, a corporation, for such franchise, and a bill and ordinance relating to the same, which said ordinance was on the 1st day of October, 1906, passed and adopted by the said board of supervisors, and was entitled an ordinance 'Granting to the Home Telephone Company of San Francisco a franchise to construct, maintain and operate a telephone system in the city and county of San Francisco, and to construct, maintain and operate through, along, under and in the public streets, alleys and highways of said city and county poles, wires, cables, underground conduits and other appliances for the purpose of transmitting sound, signals and conversation by means of electricity or otherwise;' that on the said 15th day of March, A. D. 1906, at the said city and county of San Francisco, state of California, and while the said matter and subject were pending before the said board of supervisors, the said Louis Glass did willfully, unlawfully, feloniously and corruptly give to said Thomas F. Lonergan, while the said Lonergan was such member of the said board of supervisors, a bribe, to wit, the sum of five thousand ($5,000) dollars, in lawful money of the United States of America, as a bribe, with the willful, unlawful, felonious and corrupt intent in him, the said Louis Glass, to corruptly influence said Thomas F. Lonergan as such member of said board of supervisors, in his action, and in his official vote, opinion, judgment and action, as such member of said board of supervisors, in and upon the aforesaid matter and subject then pending before said board of supervisors as aforesaid, and which was afterward to be considered, and was considered, by said board of supervisors," etc.

It is first objected that it is not alleged that defendant knew that Lonergan was a member of the board of supervisors. The statute under which the indictment was drawn (Pen. Code, sec. 165) does not expressly require that the defendant knew the person bribed to be a member of any board of supervisors. The language of the statute in this regard is "with intent to corruptly influence such member in his action on any matter or subject pending before or which is afterward to be considered by, the body of which he is a member." The language of the indictment carefully follows this language of the statute, and we think is all that is required in this respect.

The allegation of the indictment that the bribe was given to Lonergan by defendant "with intent in him, the said Louis Glass, to corruptly influence said Thomas F. Lonergan, as such member of said board of supervisors, in his action, and in his official vote, opinion, judgment and action, as such member of said board of supervisors," necessarily carries with it the fact of knowledge in Glass that Lonergan was a member of such board. To a person of common understanding, when it is charged that a defendant gave money to a member of a board of supervisors with intent to influence him as *such member of said board of supervisors in his official vote, judgment and action as such member of said board of supervisors,* it clearly appears that said defendant knew such person to be a member of said board.

This is the view taken of a similar allegation, drawn under a similar statute in *State* v. *Dankwardt,* 107 Iowa, 704, [77 N. W. 495].

The case of *State* v. *Howard,* 66 Minn. 309, [61 Am. St. Rep. 403, 68 N. W. 1096], does support the contention of defendant, but though it was cited in *State* v. *Dankwardt,* it was not there followed. Neither do we think it should be followed.

The other cases cited by defendant on this point are cases for uttering forged instruments, assaults on public officers, and the like, where there was nothing in the indictment that necessarily or at all imported knowledge on the part of the defendant of the forged character of the instrument, or the official character of the person assaulted.

In the case at bar the language of the indictment not only follows the language of the statute, but, to a person of common understanding, necessarily imports knowledge on the part of the defendant of the official character of the person bribed.

It is next urged that the indictment fails to state an offense because it is not alleged that the money was given to influence *unlawfully* said Lonergan as such member of said board.

The language of the indictment is "with the willful, unlawful, felonious and corrupt intent in him, the said Louis Glass, to corruptly influence said Thomas F. Lonergan," etc. This fully covers the language of section 165 of the Penal Code, which is: "Every person who gives or offers a bribe to any member of any . . . board of supervisors . . . with intent to

corruptly influence such member in his action on any matter, etc." The word "unlawfully" is not used in this section to qualify the verb "to influence," but the word "corruptly" is used instead.

But this section does not specify of what the bribe may consist, and appellant points to subdivision 6 of section 7 of the Penal Code as defining "bribe." It is there said: "The word 'bribe' signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his action, vote, or opinion, in any public or official capacity." It is manifest that the principal and particular purpose of this provision of the statute was to define the word "bribe" used as a noun, and to indicate what things may be given or accepted as a bribe. Section 165 relates particularly to the bribery of members of boards of supervisors and similar boards. The use of the word "unlawfully" as qualifying "to influence" in subdivision 6 of section 7, adds nothing to the meaning of section 165. It is inconceivable that any officer may be corruptly influenced in his official action by the giving to him of money without unlawfully influencing him. If defendant had the intent to corruptly influence Lonergan, as a member of the board of supervisors, by giving him money, he had the intent to unlawfully influence him in so doing. There can be no corrupt influencing of a member of a board of supervisors in his official action, by the giving to him of money, which is not an unlawful influencing of such member. There can be no intent to corruptly influence an officer in his official capacity, by giving to him money, that is not an intent to unlawfully influence such officer in such action. The contention of appellant upon this point cannot be sustained.

The indictment is also attacked for uncertainty in several particulars.

Under this head it is claimed that it does not state with certainty what matter and subject were then pending before the board of supervisors, or with what intent the bribe is alleged to have been given.

While the indictment in this regard is not a model to be commended, we think that from the language of the indictment any person of common understanding would know that

an application, made June 12, 1905, by the Home Telephone Company of San Francisco, a corporation, for a franchise for constructing, maintaining, and operating a telephone system in the said city and county of San Francisco, was pending before said board, and that the bribe was given with intent to influence said Lonergan in his action as a member of said board on said application, and in this respect the indictment is sufficient. (Pen. Code, sec. 950, subd. 2; sec. 959, subd. 6; *People* v. *King*, 125 Cal. 370, [58 Pac. 19].)

It is equally clear that the indictment charges that the matter in regard to which the offense was committed, was not only then pending, but was afterwards to be considered. A matter may be "to be afterwards considered" that is pending at a given time.

It is next urged that the indictment fails to state what acts Lonergan was to do, or omit to do. In considering this objection, it may be well to examine the statute with care. It is divided into two parts—the first is directed against a person who bribes or offers a bribe to a member of certain designated boards, with intent "to corruptly influence such member in his action on any matter or subject pending before, or which is afterwards to be considered by, the body of which he is a member." It appears from the indictment that the bribe was given with the intent to influence Lonergan in his vote and action as a member of said board of supervisors on the described application for the described franchise, and, we think, sufficiently shows that the act intended to be influenced was an official act. We know as a matter of law that the board of supervisors of the city and county of San Francisco has jurisdiction to grant franchises to maintain and operate telephone systems in said city and county. A vote by a member of said board as such on an application therefor would necessarily be an official act. To require the pleader to state with extreme particularity the manner in which it was intended that the person bribed should act or vote in such cases as this would often defeat the purposes of the act.

In the case of *People* v. *Ward,* 110 Cal. 369, [42 Pac. 894], cited by appellant, the defect in the indictment was that it charged that defendant did give a "bribe," without in any way specifying in what the bribe consisted. The indictment thus failed to state the facts as to the *bribe,* in accordance

with subdivision 6 of section 7, and it was for this defect that the indictment was held to be bad. No such defect appears in the indictment in the case at bar.

The motion in arrest of judgment was properly denied.

Over the objections of appellant the court permitted the prosecution to introduce evidence as to acts and doings of the Home Telephone Company of Oakland, and its officers and agents. The effect of this evidence was to show that in 1902, one Mr. Beasley, an attorney of San Jose, acquired a franchise to operate and maintain a telephone system in the city of Oakland, where the Pacific States Telephone and Telegraph Company, of which defendant was vice-president and general manager, had a telephone system, operated in connection with its system throughout the state; that Beasley was induced to procure such franchise by one Halsey, who was a general agent of said Pacific States Telephone and Telegraph Company. This franchise was eventually assigned to the Home Telephone Company of Oakland. All the expenses of this telephone company, amounting to from twelve to fifteen thousand dollars, were furnished by Mr. Halsey. The evidence tended to show that the purpose of organizing this company, and procuring such franchise, was to forestall competition and opposition to the Pacific States Telephone and Telegraph Company.

Also, over the objection of appellant, the court permitted the prosecution to introduce a large amount of evidence in regard to proceedings had before the city council of the city of Oakland in the matter of the application of the Home Telephone Company of Alameda County to obtain a franchise for a telephone system in the city of Oakland. This evidence tended to show that the Pacific States Telephone and Telegraph Company, through its employees and an attorney employed for that purpose, opposed such application, and that its president, Mr. Sabin, who died before the bribery charged in this case occurred, signed a statement, which was read before the city council of Oakland, objecting and protesting against the granting of a franchise to the Home Telephone Company of Alameda County. At the instance of the local attorneys of the two companies a visit was made by certain members of the city council of Oakland to the city of Los Angeles, to examine the operations and workings of the different systems used in that city, and the expenses of such trip

were borne equally by the two companies. It was shown that Mr. Glass met two of the councilmen of the city of Oakland at a lunch, arranged by the attorney of the Pacific States Telephone and Telegraph Company, and explained to them the merits of the system of his company (the manual system) over the system of the other company (the automatic system). Much other testimony concerning the Oakland proceedings was given over the objection of appellant.

It is not suggested by any one that any of the proceedings in Oakland involved any criminal act by any person.

Appellant does contend, however, that it was all irrelevant to the offense charged against defendant, and for which he was on trial, to wit, the bribery of Lonergan, as a member of the board of supervisors of the city and county of San Francisco, and for that reason should not have been permitted.

It appears to us to be so. As a general rule, evidence of the commission of a different offense cannot be admitted in proof of the offense for which the defendant is on trial, and this rule excludes all evidence of collateral facts or matters which are incapable of offering a reasonable presumption or logical inference as to the principal fact or matter in dispute. (*People* v. *Lane,* 100 Cal. 379, [34 Pac. 856]; *People* v. *Hurley,* 126 Cal. 351, [58 Pac. 814]; *People* v. *Sharp,* 107 N. Y. 427, [1 Am. St. Rep. 851, 14 N. E. 319]; *People* v. *Tucker,* 104 Cal. 440, [38 Pac. 195].)

*People* v. *Sharp,* 107 N. Y. 427, [1 Am. St. Rep. 851, 14 N. E. 319], is a very pertinent case in support of the contention of appellant. In that case the defendant was on trial for giving a bribe to a member of the common council of the city of New York, with intent to influence him as such member regarding an application for a franchise to construct a street-railway desired by defendant. The trial court allowed evidence of an attempt to bribe an attache of the legislature concerning a bill that would eventually aid him in procuring the franchise concerning which he was charged with bribing the New York councilman, or, as stated in the argument addressed to the court: "Jacob Sharp was accused and brought to trial for bribing the aldermen of the city of New York, and by that means procuring the grant of a valuable right. Evidence was offered to show that not long before he had attempted to bribe another official person to do an act which,

as he thought, would promote the scheme which he had so long pursued." The court held the action of the trial court to be error.

The case of *People* v. *Hurley,* 126 Cal. 351, [58 Pac. 814], is also a bribery case. Defendant was a member of a nominating convention, and was charged with offering to receive a bribe from one Imrie to vote for him for the nomination for school superintendent. The court allowed evidence that he offered to accept a bribe as a member of the same convention from another candidate for the same office, and for this error alone the judgment was reversed. The court said: "The court erred in receiving the testimony. There was no connection between the interview with Miss Thompson and that with Mr. Imrie. The only effect would be to show that he was likely to ask other candidates for a consideration for his vote or influence, or, as said by the district attorney, 'it will tend to show whether or not he approached this other candidate'; but if it had that tendency it was only because he had shown himself capable of perpetrating such offenses. There is no necessary or logical connection between the two cases."

So in the case at bar, there is no necessary or logical connection between the fact that defendant, or the company of which he was general manager, attempted to prevent a rival company from obtaining a franchise in Oakland, and that he or his company attempted to forestall competition in Oakland, and the offense charged that he bribed a member of the board of supervisors of the city and county of San Francisco to prevent a rival company from getting a franchise in the city and county of San Francisco.

The attorneys for the prosecution concede that the evidence did not tend to show that the defendant committed any crime in connection with the attempt to forestall and prevent competition in Oakland, but they claim that the evidence was admissible for the purpose of showing defendant's motive. To this we cannot agree. By no reasonable hypothesis can it be said that the proceedings in Oakland furnish or prove a motive for the bribery of Lonergan. There was no causal connection between the two proceedings. Undoubtedly the primary motive for the several different proceedings was the same, to wit, the advancement of the interests of defendant's company by preventing competition. But the connection

between such motives is no different from the connection that exists between the motives for several distinct larcenies committed by the same person, the motive in each case being pecuniary gain for the perpetrator of the larcenies. The defendant had the right to be tried upon the issue made by the indictment and his plea of "Not guilty," and to have all irrelevant and immaterial matters excluded from the jury, as its only effect would be to cloud the issue and injure defendant. The rule that the evidence shall be confined to the point in issue is elementary even in civil cases. In criminal cases, where the liberty of the defendant is involved, and where collateral matters often influence the jury, the necessity for the rule is much stronger. The defendant is expected to come into court prepared to meet the charge in the indictment, but cannot expect to be prepared with evidence as to any collateral matter. The rule is well established that such evidence is not admissible unless it conduces to the proof of a pertinent hypothesis which, if sustained, would logically influence the issue. To admit evidence of collateral matters that do not tend to prove either the issue, the motive, the guilty knowledge, or the probability of a theory, or the identity of the defendant, would be but to oppress the defendant by trying him on a case as to which he has not been notified, and for the trial of which he is not prepared. The indictment charges the defendant with giving a bribe in March, 1906, to a supervisor in the city and county of San Francisco. Any person of ordinary understanding would at once say that defendant had no notice by the indictment as to the many acts and the conduct of the Home Telephone Company of Oakland, in another county, which took place in 1902.

That evidence as to offenses other than the one for which defendant is being tried, may be given to show a motive for the commission of the crime is not doubted. But the motive for the commission of the crime charged must grow out of the collateral crime. Such are *People* v. *Cook,* 148 Cal. 341, [83 Pac. 43] ; *People* v. *Brown,* 130 Cal. 594, [62 Pac. 1072]. It is not sufficient that both crimes spring from the same motive. If so, one charged with a particular larceny might be proved guilty of many other larcenies, for all spring from the same motive—the desire for gain. So, too, a collateral crime may be proved against a defendant which shows the intent with

which he did the act under investigation (*People* v. *Wilson,* 117 Cal. 688, [49 Pac. 1054]; *People* v. *Valliere,* 123 Cal. 576, [56 Pac. 433], or that directly tends to show that the defendant committed the crime of which he stood charged. (*People* v. *Rogers,* 71 Cal. 565, [12 Pac. 679].)

There is nothing in *People* v. *Craig,* 111 Cal. 460, [44 Pac. 186], that supports the contention of respondent that this evidence was admissible. In the Craig case defendant had testified that the killing of his wife, for which he was being tried, was accidental. To rebut this the people were allowed to prove that immediately after killing his wife he drove to the house of her father and mother, and at once deliberately killed them both. It was held that this, in connection with evidence of previous threats made by him against his wife and her family, tended to show that the killing of his wife was not accidental, but was in pursuance of a previous plan. The facts of the Craig case bear no similarity to the conditions of this case in the matter now under discussion.

The evidence as to the Oakland proceedings was clearly irrelevant to the charge upon which defendant was being tried, and the rulings permitting its introduction were clearly erroneous.

Upon the trial evidence was given that ten of Lonergan's fellow-members of the board of supervisors were bribed in the same manner, for the same purpose, at about the same time, and by the same person, as Lonergan. Appellant insists that the court erred in allowing this evidence over his objections.

We have before stated that, as a general rule, evidence of a different offense may not be given against a person charged with a particular crime; but as we have also before stated, there are exceptions to this rule. Where facts concerning the other offense tend in themselves to prove the defendant guilty of the offense for which he is being tried, they may be proven. The mere fact that such evidence tends to prove defendant also guilty of another crime does not exclude it, if relevant to the charge for which he is on trial. The evidence as to the bribery of the other supervisors, we think, is well within this exception to the general rule. It is not claimed by the people that defendant personally bribed Lonergan, or any other member of the board. Any money that was paid for such

purpose was paid by one Halsey, who was shown to be a general agent of the Pacific States Telephone and Telegraph Company, with the special duty of attending to matters pertaining to opposition to the company. It was the theory of the People that the bribery of Lonergan was in pursuance of a conspiracy on the part of defendant and Halsey and one Zimmer, auditor of the company, to defeat the application of the Home Company by bribing the board of supervisors, that is, a working majority thereof. The bribery of Lonergan was but a part of the whole—was one step in a proceeding having one purpose and object. It was shown that checks of the company aggregating between forty thousand dollars and fifty thousand dollars were drawn at the request of Zimmer about the latter part of February, 1906. To whom they were payable was not shown. No vouchers were furnished for these checks, and they were simply carried on tags. These tags, as well as the checks were destroyed in the great fire of the following April. Statements of banks, however, showed that checks of the company aggregating fifty thousand dollars were paid, or the amounts thereof withdrawn from the accounts of the company as follows:—

February 23, 1906: $5,000, $5,000, $10,000;

February 24, 1906: $10,000, $10,000, and

February 26, 1906: $10,000.

The statements from banks show many other withdrawals, but these items are significant as being in round thousands, and as corresponding in the total to the amounts paid the supervisors. The evidence shows that for a few days only, but covering the twenty-third and twenty-fourth days of February, 1906, Halsey engaged three rooms in the Mills Building. The application of the Home Telephone Company was to come up for action before the board of supervisors on Monday, the twenty-sixth day of February, 1906. (The board consisted of eighteen members, and it required at least ten to constitute a majority.) Lonergan testified that on Saturday, February 24, 1906, he visited Halsey at the rooms in the Mills Building, found one Kraus, an assistant to Halsey, there in one room, scantily furnished, and was by him shown into an adjoining room, also scantily furnished, where he met Halsey, who gave him four thousand dollars in currency, and told him to vote to defeat the ordinance granting the Home Tele-

phone Company a franchise. He took the money home and gave it to his wife, who testified that about that time her husband handed her four thousand dollars in currency. Eight of the other supervisors testified to going singly to Halsey's rooms in the Mills Building a few days before the twenty-sixth day of February, 1906, and receiving money in currency to vote against the application of the Home Telephone Company for a franchise. Each went into Halsey's room alone, and was paid by Halsey in currency to oppose the application of the Home Telephone Company, and took his departure. No person other than Halsey and the supervisor being paid was present at any payment. Two other supervisors were paid five thousand dollars in currency, each a little later, by Halsey for their friendship to his company, in the matter of the application of the Home Telephone Company. The total of the payments was fifty thousand dollars, exclusive of one thousand dollars paid Lonergan some days prior to his visit to the Mills Building. These payments were all made to carry out one plan and purpose—to secure a majority of the votes of the board of supervisors to defeat the application of the opposition company.

Several of the bribed supervisors returned to Halsey in currency a part of their bribes, aggregating seven thousand five hundred dollars. It was shown that a similar amount ($7,500 or $10,000), also in currency, was returned to the cashier of the company by Halsey, and credited in reduction of the amounts charged on the tags above referred to.

No rational person, with knowledge of the facts concerning the visits of, and payments to, the supervisors other than Lonergan, on learning that Lonergan also visited Halsey at the time he did, and where he did, and about the same time handed his wife four thousand dollars in currency, but would be impressed with the belief that Lonergan also obtained such currency from Halsey, and for the same purpose as his fellows; and this belief would be engendered without any direct evidence of any payment to Lonergan.

The facts testified to by these witnesses, in connection with other facts above mentioned, tended to show that Lonergan was bribed, and with money drawn from the funds of the Pacific States Telephone and Telegraph Company, by Halsey.

"If several and distinct offenses do intermix and blend

themselves with each other, the details of the party's whole conduct must be pursued." (Lord Ellenborough in *The King* v. *Whiley,* 1 Lead. Crim. Cas. 185.) The several briberies were to secure one result, and were part and parcel of one scheme.

That the testimony in question was properly admitted is amply sustained by the following authorities: *People* v. *Rogers,* 71 Cal. 365, [12 Pac. 679]; *People* v. *Cook,* 148 Cal. 341, [83 Pac. 43]; *People* v. *Craig,* 111 Cal. 460, [44 Pac. 186]; *People* v. *Molineux,* 168 N. Y. 34, [61 N. E. 286]; *People* v. *Wood,* 3 Park. Crim. Rep. (N. Y.) 681; *People* v. *Murphy,* 135 N. Y. 455, [32 N. E. 138].

The theory of the prosecution in offering said evidence, and of the court in receiving it, was that the evidence is sufficient to charge defendant with criminal responsibility for the various acts of Halsey; and the views we have expressed are based upon such theory, but we do not intimate our views as to the sufficiency of the evidence to support it.

Appellant urges that error was committed in overruling his objection to a question put to the witness King, a director of the Pacific States Telephone and Telegraph Company, as to whether he knew that a salary of twelve hundred dollars or twelve hundred and fifty dollars a month was paid to Abraham Ruef during the period covering the pendency of the application of the Home Telephone Company for a franchise, but as the answer was in the negative no harm was done by the ruling, even if it be conceded to have been erroneous.

The court did not err in allowing the district attorney, over the objection of defendant, to prove by Mr. Pillsbury, the conversation held between him and the defendant concerning the employment of Mr. Ruef. Mr. Pillsbury was the head of the law department of the company; and in answer to the question objected to testified: "I called Mr. Glass' attention to something I had seen in the papers to the effect that Mr. Ruef was employed, or was to be employed, as an attorney for the company, and asked him what there was in it, and he told me that Mr. Ruef was employed. That was about November, 1905. . . . I asked him if Mr. Ruef was employed. He said he was. I told him if Mr. Ruef was to be a member of the law department of the company that it would eliminate me from it, or to that effect, and he said Mr. Ruef was not

employed to represent the company in connection with my department, and had nothing to do with it. That was the substance of it."

The evidence relied upon by the prosecution to connect de-. fendant with the bribery of Lonergan was entirely circumstantial, and depended largely upon showing that he was connected with and a party to a scheme to bribe a working majority of the board of supervisors in relation to the application for the franchise which had been pending before the board for several months before the bribery was consummated.

Defendant had already drawn out from the witness Boxton evidence to the effect that Mr. Ruef was the boss of the board of supervisors, with a representative thereon who had distributed bribe money to the members of the board in reference to another ordinance. Another witness, Supervisor Phillips, testified that he had been offered a bribe by Halsey to stand by his company. Phillips answered that he could not do so unless released by the administration, or Mr. Ruef, and then left Mr. Halsey. Later in the day Halsey telephoned to him to come to the Mills Building, which he did. Halsey then stated to him that from what he knew Ruef was favorable, and Phillips then agreed to stand with him, and received two thousand five hundred dollars in currency, and a promise of five thousand when the Home Telephone ordinance was defeated.

The prosecution had the right to contend that, from the conversation testified to by Mr. Pillsbury, the defendant was responsible for the employment of Ruef. Where circumstantial evidence is relied on to connect a defendant with a given crime, much must be left to the discretion of the trial court in admitting it. It is not necessary that each circumstance, of itself, would to every person appear to connect the defendant with the offense. It is sufficient if such circumstance, considered in relation to other facts and circumstances in evidence, may fairly tend to such result.

We do not think there is any merit in the contention made by appellant of variance between the crime charged and the crime proved. The claim of a variance as to the subject matter for which the money was paid to influence Lonergan, is sufficiently answered by what we have said as to the sufficiency of the indictment.

As to the amount of money paid, the indictment charges a payment of $5,000. The proof showed a payment to Lonergan of $1,000 on one day, with a promise of $4,000 more, for Lonergan's friendship for the Pacific States Telephone and Telegraph Company, which was in fact paid a few days later. Proof of the payment of either $1,000 or $4,000 would have supported the substance of the charge in this regard. Proof of the larceny of $4,000 or $1,000 would sustain a charge of the larceny of $5,000. So it is perfectly clear to us that under a charge of paying $5,000 as a bribe, proof of the payment of such sum in two payments under an agreement to pay and to receive $5,000, as a bribe to do a certain thing, presents no question of variance as to the thing paid as the bribe.

Defendant requested the court to give to the jury certain instructions, numbered 4 and 5, as follows:—

4. "You have no right to indulge in any presumption or inference unfavorable to the defendant because of the refusal of any witness to testify, or the failure of any witness to testify for the prosecution."

5. "The refusal of an alleged co-conspirator, or agent of the conspiracy, who has been placed on the witness stand, and refused to testify, should not be considered by the jury in determining the guilt or innocence of the defendant, and the jury should not presume from such refusal to testify that the testimony of the witness, if given, would be against defendant."

Both of these instructions state a correct rule of law; and that they were pertinent to the case is shown by the following circumstances: The case was submitted to the jury on the evidence introduced by the prosecution, no evidence being introduced by defendant. Evidence had been introduced tending to show that one E. J. Zimmer was the auditor of the Pacific States Telephone & Telegraph Company; that the checks, aggregating between forty thousand dollars and fifty thousand dollars, upon which the prosecution claimed the money had been drawn, with which Lonergan and his fellows had been bribed, were drawn by order of said Zimmer, and were delivered to him. When delivered to him the checks bore the signature of the treasurer of the company, but required to be further signed, by any one of the following names: "Henry T. Scott, President," "E. J. Zimmer, for the

President," or "Louis Glass, Vice-President." The prosecution called E. J. Zimmer as a witness, and put to him the following questions: "What were your duties as auditor?" "You testified fully before the grand jury in this matter, did you not, Mr. Zimmer?" "Mr. Zimmer, did you answer that question before the grand jury, that I have just asked you here, to wit, as to what your duties were as auditor of that company?"

Mr. Zimmer refused to answer each of these questions, upon the ground that it would have a tendency to subject him to punishment for a felony. He was not compelled to answer.

In the closing argument the attorney of the people claimed that the evidence showed that Zimmer, Glass and Halsey were each guilty of bribing Lonergan; and with reference to Zimmer he used this language: "Mr. Zimmer's name appears on the indictment as a witness before the grand jury. You have not heard what he testified to. You have not received any intimation of what he testified to, although I would have been justified, in making my opening statement in this case, to have said to you what I expected to prove by E. J. Zimmer, whom I called as a witness in this case. I did not do it, because I want to play the game square. I would have had a right to say what I expected to prove, because I had a right to expect that every citizen in the state of California would perform his duty and comply with the social compact by which he receives protection to his life, his property, his wife and his children. I had a right to expect that when Mr. Zimmer was called upon this stand as a witness, he would tell what he knew, and not protect crime by the claim that it might tend to incriminate himself. But, as I say, out of a spirit of fairness, I did not say anything in my opening statement as to what I did expect to prove by Mr. Zimmer, and therefore there is nothing before you."

This language was well calculated to impress upon the jury that the evidence that Zimmer refused to give would have tended to prove the defendant guilty; that his refusal to tell what he knew was to "protect crime." No objection appears to have been made to these remarks of the district attorney, and we only advert to them because they emphasize the necessity that the requested instructions should have been given.

In refusing to testify Zimmer was in the exercise of a clear

right given to him by the constitution of the state and the statute, for which under the law no inference against the defendant may be drawn.

The precise point involved in the refusal to give the instructions now under discussion was decided in *People* v. *Irwin,* 77 Cal. 494, [20 Pac. 60], where the court said: "The court also erred in refusing to instruct the jury that the refusal of the alleged conspirators, who had been placed on the witness stand and declined to testify, should not be considered by the jury in determining the question of guilt or innocence, and that the jury should not presume from such refusal to testify that the testimony, if given, would be against the defendant."

The language of the refused instruction numbered 5 is taken almost literally from the language above quoted. It contains a correct statement of the rule of law applicable to the condition of this case, irrespective of the remarks made by the district attorney, and these remarks made it all the more necessary that the requested instructions, or one embodying the rule stated, should have been given. The court erred in refusing to give the requested instructions. (*People* v. *Irwin,* 77 Cal. 494, [20 Pac. 60]; see, also, *People* v. *Opie,* 123 Cal. 294, [51 Pac. 989]; *Phelin* v. *Kenderdine,* 20 Pa. St. 354; *Beach* v. *United States,* 46 Fed. 754.)

The court did not err in refusing an instruction requested by the defendant, to the effect that, in passing upon the credibility of witnesses, the jury have the right to take into consideration their motives, fears, or hopes, if any have been proved. This was sufficiently given by the court in reading to the jury section 1847 of the Code of Civil Procedure. "Fears or hopes" but express an amplification of "motives," and really add nothing to the meaning of section 1847.

In addition to the points discussed in this opinion, appellant has urged that the evidence is not sufficient to support the verdict of guilty. Inasmuch as the judgment and order must be reversed for the errors above noted, and the case remanded for another trial, we do not deem it necessary to pass upon this question.

The judgment and order are reversed, and the cause remanded for a new trial.

Cooper, P. J., and Kerrigan, J., concurred.
    CLVIII Cal.—44