[Crim. No. 290.   Third Appellate District.—April 26, 1915.]

## THE PEOPLE, Respondent, v. JOHN M. LEVEL, Appellant.

CRIMINAL LAW—MURDER—SUFFICIENCY OF EVIDENCE.—In this prosecution for murder it is held that the verdict finding the defendant guilty of murder of the second degree is supported by the evidence.

ID.—EVIDENCE—DYING DECLARATION—OPINION OF DECEASED AS TO RESPONSIBILITY FOR HOMICIDE—PROPER INSTRUCTION TO JURY.—An instruction to the jury in such a prosecution that if they believed from the evidence that the deceased, after he was shot, made a statement as to who shot him, and under what circumstances the shot was fired, and that at the time he made such statement he believed he would die from the effects of said shot and entertained no hope for recovery, then they should give such statement, if proven, as much weight as if he were duly sworn, present, and testified in the case, is not subject to the objection that the instruction is not applicable to the facts, because the deceased did not speak of the circumstances under which the shot was fired but said he was not to blame, where the evidence, independent of such opinion, shows that the defendant was to blame for the homicide.

ID.—RESPONSIBILITY FOR HOMICIDE — OPINION OF DECEASED — ATTACK UPON APPEAL.—The introduction in evidence of the opinion of the deceased that he was not to blame for the homicide cannot be attacked upon appeal for the first time, where the same was elicited by an unobjectionable question and no motion made to strike out the answer.

ID.—STATEMENT OF DEFENDANT TO DISTRICT ATTORNEY—VOLUNTARY CHARACTER.—It is also held in this case that the preliminary proof as to the voluntary character of the statement made by the defendant to the district attorney was sufficient to warrant its introduction in evidence.

ID.—CAUSE OF SEPARATION OF DEFENDANT FROM WIFE—PROPER CROSS-EXAMINATION.—Where the wife of the defendant had virtually testified that she was induced to leave her husband by the solicitations and importunities of the deceased it was open to the prosecution to assail the credit of this statement by inquiry as to whether she had not declared that she left on account of the ill-treatment of her husband.

APPEAL from a judgment of the Superior Court of Shasta County and from an order denying a new trial.   W. D. Tillotson, Judge.

The facts are stated in the opinion of the court.

Breynard & Kimball, and Oscar Gehalle, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

BURNETT, J.—Defendant was convicted of murder in the second degree and the appeal is from the judgment and the order denying his motion for a new trial. The evidence without conflict shows a deliberate, premeditated murder and defendant was fortunate in escaping a verdict for the higher offense. The homicide occurred at the home of one J. K. Kelly, about three miles east of Redding, Shasta County. On the evening of August 1, 1914, deceased and Mr. and Mrs. Kelly were engaged in conversation on the front porch of the Kelly home. The deceased sat in a small rocking chair at the southeast corner of said porch, and J. K. Kelly reclined on a roll of blankets at the northwest corner of the porch. Until a few minutes before the killing Mrs. Kelly was in a hammock which was hung from the northeast to the southwest corner of the porch. About 9 :30 o'clock p m. appellant went to the Reid & Adams livery stable in Redding and asked for a rig to go to Clear Creek. He came, however, to the Kelly home, arriving about midnight, hitched his horse in front of the house and approached the front porch through the front gate. Deceased was still sitting in said rocking chair and J. K. Kelly reclining on said roll of blankets. What then occurred may be stated in the language of Kelly: ''He was singing, 'Doodle, doodle, doodle, doodle,' as he oftentimes did about his common business. He came up and he says, 'You are the man I am after.' Stepped his right foot onto the porch and says, 'I will let you know that no God damned son-of-a-bitch of a dago can step between me and my wife,' and he (Joseph Parenti, the deceased), sat pretty quiet, considering the fire, and at that time—about that time, he made something like such a motion as this: (Illustrating by arising from the witness chair and extending both arms out in front slightly spread apart) towards John M. Level. And he then drew right back and the firing commenced, and then he was on the run, really, and two shots were fired there, and he really was on the run at the time. It was all over instantaneous. Q. In what direction did the deceased, Joseph Parenti, reach out his hands, as you have illustrated? A. Well,

right over the hammock towards John M. Level. Q. Did the deceased place his hands upon or reach the defendant, John M. Level? A. I don't think that he reached him. It was quite a distance across there, and that I couldn't positively say that he reached him or not, but if he didn't, he was close to him. Q. And after the deceased, Joseph Parenti, reached as you have illustrated, toward the defendant, John M. Level, what did he next do? A. The deceased? Q. Yes. A. He ran and disappeared through the front door, there, into the dining room.'' It appears further that appellant crawled under the hammock and followed deceased and, as he was pursuing, he said: ''I will have you yet, you son of a bitch of a dago; I will kill you yet.'' Appellant stopped at the door of the front bedroom, pushed it open, knocking a lamp out of the hand of Mrs. Kelly and saying, ''Is the son of a bitch in here?'' He then continued the chase through the house to the rear and Mr. and Mrs. Kelly heard another shot fired. Appellant returned to the house and said to Mr. Kelly, ''Come and see what I have done.'' Kelly went into the field and found Parenti about two hundred and seventy feet from a side gate in the fence between the yard and said field. Parenti was on his hands and knees and was in a dying condition. He was shot in the back, the bullet having entered about three inches to the right of the spine and producing a wound necessarily fatal. There is not found in the record the shadow of justification or excuse for the homicide. Even defendant's explanation of the affair affords no substantial support to any valid claim of self-defense and it was not even pretended that he was insane. In his statement made after his arrest to the district attorney he declares that he went to Kelly's to warn deceased not to interfere with appellant's family and he found deceased sitting on the porch and ''I says, 'You are the man I want.' I says, 'I want to inform you not to come between me and my wife.' So I says, 'If you see her, don't speak to her.' I says, 'If you do, I will follow you to the end of the world, or get you.' So he got indignant. He says he does as he God damned please to do. I says, 'Don't get excited; don't open your head, or I will blow it off. You have interfered as far as I am going to bear.' He jumped up and got a chair and I shot at him. Mr. Chenoweth: How many times? Mr. Level: Three. Mr. Chenoweth: Three times on the front porch? Mr. Level: He went

through the sitting room. I shot. So I run out the back. He was as far as from here to the street. I shot at him the third time. He went through the house, out the back door, out the side gate east of the house, just run south down the fence to the field. I followed him to the gate and fired at him. Mr. Chenoweth: Did you see him drop? Mr. Level: He staggered and fell on the—up on the fence. I walked up within forty feet and he was groaning. I turned and went to the house. Mr. Chenoweth: He was running when you shot the last time? Mr. Level: Yes, sir. Mr. Chenoweth: From you? Mr. Level: Yes, sir.''

Comment on the foregoing is not called for. It may be said, however, that as to the chair he was contradicted by the testimony of Mr. and Mrs. Kelly, the latter stating that when she went out on the porch immediately after the shooting she noticed the condition and position of the rocking-chair in which deceased had been sitting, and that the chair remained in its same position on the southeast corner of the porch with the cushion in the seat and deceased's hat was hanging on the back. From this, of course, the inference would follow that deceased had not picked up the chair or disturbed it as claimed by appellant. But, according to his own statement, it is manifest that the episode of the chair furnished no justification for the subsequent pursuit and killing of deceased.

We have, therefore, a case of such clear and convincing proof of murder that it is impossible to conceive of an intelligent, fair-minded jury granting any greater favor to the defendant than finding him guilty of murder in the second degree. With the foregoing in view, we might with propriety dismiss the various assignments of error with the general observation that they should be disregarded as not affecting appellant prejudicially. Indeed, no case could be presented calling more persuasively for the application of the principle embodied in the recent amendment (art. VI, sec. 4½), to the constitution. However, we may express our opinion somewhat sententiously as to these assignments of error.

The court gave this instruction: ''If you believe from the evidence that the deceased, after he was shot, made a statement as to who shot him, and under what circumstances the shot was fired, and that at the time he made such statement he believed he would die from the effects of said shot and

entertained no hope of recovery, then you will give such state-
ment, if proven, as much weight as if he were duly sworn,
present and testifying in the case.'' The objection is that
''this instruction was not applicable to the facts. Deceased
did not speak of the circumstances under which the shot was
fired. Deceased said he was not to blame. The instruction
in effect directed the jury to give as much weight to the dying
declaration of deceased that he was not to blame, if proven,
as if deceased were duly sworn, present, and testifying in the
case. If deceased had been duly sworn, present, and testify-
ing in the case he would not have been permitted to express
the opinion that he was not to blame.'' It is claimed, and
justly so, that declarations of a deceased person to be admis-
sible in evidence must relate to facts and not to mere matters
of opinion. (*People* v. *Taylor,* 59 Cal. 640.) Appellant is
right in his statement of the principle of law and in his con-
tention that the instruction ''was not applicable to the facts.''
But, as already has appeared, there was no room for any
difference of opinion as to who was to blame for the homicide.
The jury must necessarily have reached the conclusion that
deceased was not to blame if they had not been so instructed
or if said opinion had not been received in evidence. In
other words, there was an irrelevant declaration of a principle
of law that did not injure and could not possibly have
injured appellant.

As to the introduction of said *opinion* in evidence, we may
mention the fact that Mr. Kelly testified that Mr. Parenti
said as many as three times that he was dying. Considering
this and the nature of his wound, there can be no doubt that
the proper foundation was laid for the introduction of his
dying statement. Then the record proceeds: ''Mr. Cheno-
weth: Now, Mr. Kelly, after the remark or remarks were
made by the deceased, Joseph Parenti, that he was dying, did
you have any conversation with him with reference to the
shooting? A. I did. Q. What was it?'' To this objection
was made on the ground that no foundation had been laid, that
it was made without the presence of the defendant, and that
it embodied the question asked by the witness of the deceased
and to that extent was a self-serving declaration as far as
the prosecution was concerned. It is clear that the objection
was properly overruled and the court did not err in allowing
the witness to answer. The witness replied: ''I asked him

if he had any feelings, anyway in the world that he was to blame for that matter, for that case of shooting. He says, "Oh, no, no." No motion was made to strike out the answer or any portion of it and it is too late for appellant to complain of it. It presents the instance of an objectionable answer to an unobjectionable question, but appellant seems to have been satisfied to let it stand.

The admissibility of said statement of appellant made to the district attorney is questioned on the ground that it was not shown to have been made freely and voluntarily. As to this we think, however, that the preliminary proof was sufficient to warrant the ruling of the court. The district attorney testified as to the interview: "I simply introduced myself to the defendant, told him that I was the district attorney and that I came to interview him if he desired to make a statement and he started in immediately to tell me a version of the shooting and after he had proceeded a short ways I had him stop and went out into the sheriff's office, and whether Miss Scamman had come with me, or whether she had just arrived at that time, I called her in and had the statement taken down."

Miss Scamman, the stenographer, testified that she took down everything that was said, and we may remark that nothing appears therein to indicate in the slightest degree that the statement of defendant was other than entirely voluntary. There was no evidence of threats, promises, duress, or coercion and it appears that the district attorney acted in the utmost good faith and was careful to take no undue advantage of defendant. It is suggested that the sheriff or jailer may have brought improper influence to bear upon the defendant to induce him to make the statement, but nothing of the kind appears, and the prosecution was not required to go further to show the voluntary character of the conversation. Of course, there was nothing to prevent the defendant from interrogating these officers as to the matter but, presumably, he was satisfied to forego the privilege.

There is some discussion as to the propriety of certain questions asked of Mrs. Level on cross-examination, but it is not apparent that any error was committed therein. On direct examination she had testified to acts of familiarity with her on the part of deceased and it was surely permissible for the district attorney to interrogate her as to contradictory

statements that she had previously made on the subject.   It is
the claim of appellant that the only purpose of the direct ex-
amination was to disclose the fact that she had complained
to her husband about her treatment by deceased, thereby to
account for the distraught condition of defendant's mind.
The inquiry, however, extended to the truth of the statements
that she claimed to have made to appellant and to this it was
manifestly proper to address the cross-examination.   It would
also be proper to test the truthfulness of the declared state-
ments as affecting the probability of whether she had such
communication with her husband at all.

Likewise, the witness having virtually testified that she was
induced to leave her husband by the solicitations and impor-
tunities of deceased, it was open to the prosecution to assail
the credit of this statement by inquiry as to whether she had
not declared that she left on account of the ill-treatment of
her husband.

But, as already stated, no court would be justified in revers-
ing the case, even if convinced that error was committed in
each of the instances referred to.

The judgment and order are affirmed.

Chipman, P. J., and Hart, J., concurred.