[Crim. No. 986. Third Appellate District.—September 26, 1927.]

THE PEOPLE, Respondent, v. ALFRED G. COAN, Appellant.

W. E. Duncan, Jr., and Mrs. Alta Hengy for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

PLUMMER, J.—By an information filed on the ninth day of February, 1927, the defendant was accused of the crime of murder, in that the defendant did, on or about the twenty-fifth day of December, 1926, at the county of Butte, in the state of California, wrongfully, wilfully, unlawfully, feloniously, and with malice aforethought, kill and murder one Aleata Pearl Coan. Trial was had upon this information, and on the twenty-sixth day of March, 1927, the jury in said cause returned a verdict finding the defendant guilty of involuntary manslaughter. The defendant's motion for a new trial being denied, the defendant appeals therefrom and from the judgment entered upon the verdict returned, as above stated.

The transcript shows that the defendant and Aleata Pearl Coan were husband and wife. That for some period of time they had resided in the county of Butte, state of California. That on the evening of December 24, 1926, the defendant and his wife, Aleata, accompanied by Mr. and Mrs. Thomas Ford, made a visit to the home of Mrs. Lockerman, the mother of Mrs. Coan. That upon arriving there they found also present Robert Childress and Francis Cory. Shortly thereafter a brother of Mrs. Coan's, Tyson Lockerman, arrived at the same residence. Tyson Lockerman invited the defendant and Thomas Ford to accompany him to a bootlegging "joint." Liquor was there procured and brought back by Lockerman to the Lockerman residence where the party was assembled. After the return from the bootlegging "joint" some time was spent in games, singing, social conversation, and drinking. There does not appear to have been any quarreling or dissension. About 12:30 or 1 A. M. of December 25, 1926, the Coans and Fords started for their respective

homes. When the Coans residence was reached, Ford and his wife stopped there, and some time was spent in listening to a radio. Then the Fords left and went to their own home. While the Fords were at the residence of the Coans, the defendant suggested to his wife Aleata that they open certain Christmas presents, but to this Aleata replied that she did not want them opened until Christmas Day. Left to themselves, after a short interval the Coans retired for the night, Mrs. Coan going to bed first. After going to bed, Mrs. Coan called to her husband to come to bed. He did so, but forgot to put out the light. Mrs. Coan then said that the last one to get into bed was the one to put out the light. Defendant, according to his statement, said it was her turn to put out the light. There is nothing to show that this conversation was other than friendly. Thereafter a scuffle ensued between the two, and the defendant pushed his wife partly out of bed with his feet. According to the defendant's statement, Aleata put her hand on the floor as her head was hanging over the side of the bed, and said, ''Look out, you're hurting me.'' Thereupon the defendant pulled her back into the bed, placed himself across her chest, and taking her head between his hands, shook it from side to side; then placed his hand on her nose, rubbing her face. Defendant suddenly noticed that Mrs. Coan had ceased to struggle with him and had become white and still. Thereupon, he went to the kitchen, got water and tried to revive her. His efforts to revive Aleata proving unavailing, he put on his clothing and went to the Lockerman home, a distance of about a quarter of a mile, for help; told Tyson Lockerman he had killed his wife and begged him to come at once and help. He then left the Lockerman home; started back to his own residence. When Lockerman and Childress, who accompanied Lockerman, reached the Coan residence they found that Aleata was dead. One of them telephoned to the sheriff and thereafter the defendant was arrested.

Just what occurred at the time of the tragedy is disclosed only by the defendant's testimony, which, as to that occurrence, is here set forth in full: ''And she went to bed and called me and after I got in bed she said to put out the light and I told her it was her turn, that she should put the light out; and when I did that I took my foot and started to push her out of the bed and she said, 'Look out you are

hurting me'; and she leaned her face over the bed. Her head was leaning over the bed, I mean, and I took hold of her and pulled her back in the bed again; and she slapped me on the covers, on the arm; and then I got up and stood up and I dropped down on her with my knees and then I sit astraddle of her and took her by the face and shook her head, and I shook her nose with my hand, rubbed her nose, and I looked at her and her—her face—her lips was white and she looked white; her mouth; and I asked her what was the matter and she never answered me; she had her eyes shut so I went and got some water and put the water on her face; and I talked to her and she never said anything; she never answered me; and I put the water in her mouth—I don't know—I don't know what I done—I put my clothes on and then I went for Ty and I got up there and I told Ty that I had killed Aleata and he—I don't know what Ty said but he said 'All right' I guess or something like that, I guess—I don't know what he said; but anyhow I went back home; I started home and when I got part way there Ty and Bob came along and put me in the automobile.''

An examination of the deceased showed that death had resulted from the dislocation of a vertebra of the neck. The neck was not broken nor was there any evidence that the deceased had been choked. There were no marks upon the body of the deceased indicating that any blow had been struck, although the defendant, in response to a question that night, stated that he must have struck her. The only mark or dislocation was the swelling on the neck of the deceased on the right side in the region of the dislocation. The defendant was a man accustomed to hard work and had rough or calloused hands. According to the testimony in the transcript, the deceased had an unusually long neck, and due to this fact, according to the testimony, a dislocation of this kind would be more easily produced than in a person of ordinary build.

During the course of the trial considerable testimony was introduced by way of cross-examination of the defendant as to his having gone through a marriage ceremony with a woman supposed to be a divorced woman, prior to his marriage with the deceased, and his separation from the first woman upon discovering that she was not a divorced person; also, there was testimony introduced as to certain offenses

alleged to have been committed against the person of said woman known as Emma Ward, and also against Eva Ward, a daughter of Emma Ward by her legitimate husband. To the introduction of this testimony the defendant objected, and to the overruling of the defendant's objections and the admission of such testimony, the appellant here assigns his reasons why a new trial should be granted. This testimony related to separate and distinct offenses alleged to have been committed long prior to the act for which the defendant was placed on trial. Under the theory that the testimony in question was admissible to show motive or intent, the prosecution placed the witness, Eva Ward, upon the witness-stand, and, over the objections of the defendant, the court permitted her to testify as follows: "I reside in San Jose. I know the defendant. He lived with my mother about ten years, I suppose. It was in Monterey County. We lived at the coal mine and on a Homestead. I was about fourteen or fifteen years of age. Q. At that time and place do you remember any relations that you had with Mr. Coan? A. There was a pencil-box, and it seems that Mr. Coan accused my brother of taking a pencil out of that box. We were all sitting around the table and he accused her kid and he swore and went into the room and brought out the pencil-box and said to my mother, 'Now I will show you that that God damned kid of yours did take the pencil out of there' and my mother caught him opening the pencil-box, and he grabbed her by the neck and stood her against the wall, and I said, 'Let my mother alone,' and the children were all hollering, and he kept on and I picked up a chair and hit him on the head with it, and he let my mother go and said, 'Here, you son-of-a-bitch, take this,' and he hit me in the eye."

This alleged occurrence took place, if at all, seven or eight years prior to the commission of the offense for which the defendant was upon trial.

For a like purpose, and upon a similar theory, the prosecution was permitted by the court, over the objection of the defendant, to elicit from the witness, Mrs. Emma Davis, testimony concerning an event which took place some four years prior to the twenty-fourth day of December, 1926. After testifying that the defendant and the woman heretofore referred to with whom the defendant had lived as his wife were in the basement of the lodging-house kept by the wit-

ness, the witness, in response to a question as to what happened there in her presence, testified as follows: "Well, he had her down on the floor and was choking her, and she hollered for me, and I went to help her, and I saw him jerk her up from the floor, and she had black marks on her; she had black marks on her side, and he hurt her so that she was in bed for two weeks under the doctor's care. I heard her holler 'Mamma D,' and told him to quit that, and she screamed and I went down there and he jerked her up off the floor and was brushing the dirt off of her." And in response to a question as to what the defendant said, the witness testified: "He said, 'Oh, hell, why didn't you stay out of here.'" There was further testimony indicating the illicit nature of the alleged assault. The testimony of the witness was further to the effect that the defendant and the woman with whom he had been living, and with whom the trouble is alleged to have occurred, had not then agreed to a separation on account of the fact that the woman had a husband living at the time of her purported marriage with the defendant.

So far as the record shows the court made no ruling limiting the purpose for which his testimony was admitted, but the statement contained in the record of one of the prosecuting officers discloses what the prosecution had in mind. We quote from the language of Mr. White: "I understand that one of the issues in this case is the motive or the intent of the defendant at the time of what he claims to be an accident. . . . and we have a right to show the defendant's inclination and the reasons and the way he treated other people and the offenses of a similar character with the people in the same relations with him, and it will give some light to the jury and will help them to understand why he acted as he did on Christmas morning. Now, here is a case where the defendant had another wife and lived with her ten years and had four children, and it was his privilege, as he claims, to attack them occasionally, and if he would attack his wife or his prior wife, it is reasonable to assume that he would attack any other wife that he had if he was in the mood for it. It would show his disposition in that direction. I understand that is the reason for the introduction of this testimony." Further on the district attorney made the following statement: "Now, this case resolves

itself as follows: Mr. Coan admitted that he killed Aleata, but he never said whether he did it on purpose or not or whether it was an accident, but the testimony that he put in goes to that effect. Now, every crime consists of two elements, the act itself and the intent. If the intent is lacking a man goes scot-free, because we have to assume that it was an accident, if so proven; but if it is not proven in the case either by the prosecution or the defense, then the law assumes a malicious intent and that he did it on purpose. But all the evidence that Mr. Duncan could get in to show that it was an accident would remove that malice and criminal intent and we could not introduce other acts, as Mr. Duncan has said . . . We could not put it on for that purpose because the defendant is entitled to be tried on this one charge—the murder of Aleata. We could not bring in a charge that he killed someone else to prove that he had killed Aleata, because he has admitted that he killed her; but we bring it in for the purpose of showing his bodily feeling or his mental feeling or what kind of a man he is with respect to the conditions that are shown up in the evidence.''

So far as the transcript discloses, up to the time of the admission of this evidence, no claim had been made by the defendant one way or the other, save and except as the plea of not guilty had been entered by him and the defendant had detailed the events of the night of December 24th and the morning of December 25, 1926. We assume, however, that the cause was argued to the jury by counsel for the defendant upon the hypothesis that no murder or serious bodily injury was intended.

■ While there are some English cases to the contrary, the unbroken line of decisions in this country and in this state is to the effect that it is improper, on the trial of a defendant for one crime, to prove that he has committed other crimes having no connection with the one under investigation. Admitting, generally, the correctness of this rule, respondent calls our attention to a few English cases holding to the contrary, and then cites certain California cases where evidence of other offenses has been admitted under the exception that evidence of other crimes is admissible when the intent accompanying the act is equivocal or where it otherwise becomes an issue in the trial, as where it is

claimed that the act in question was free from a felonious intent or was the result of mistake, accident, or inadvertence.

In *People* v. *Sanders,* 114 Cal. 216 [46 Pac. 153], the first case relied upon by the respondent, the defendant Sanders was placed upon trial for forgery. The forgery consisted in simulating the name of one William Wootton, the charge being that Sanders had forged the name of said Wootton to a draft drawn upon Kutner-Goldstein Company of Fresno. For the purpose of showing the fact of forgery, certain evidence was introduced tending to show, and which in all reason did show that William Wootton had been feloniously put out of the way by Sanders prior to the date of the alleged forgery, and as an occurrence or event leading up to the forgery in consummating a plan previously conceived by the defendant, and by him carried into execution in an attempt to secure for himself property belonging to the said William Wootton. Being part and parcel of the same transaction, the evidence was held admissible under the exceptions to the rule excluding evidence of other offenses than the one for which the defendant was being tried.

Again, in the case of *People* v. *Craig,* 111 Cal. 460 [44 Pac. 186], the defendant was placed on trial for killing his wife, a member of the Hunter family. The evidence showed that the defendant went to the home of the Hunters, where he found his wife, who was a daughter of the Hunters, and also a brother of his wife; that he, then and there, being armed with two revolvers, killed both of said persons. Upon the trial testimony was admitted that the defendant had made threats against the Hunter family and stated that something would happen. Being part and parcel of the same transaction, and the two persons killed being members of the Hunter family, such evidence was unquestionably admissible, irrespective of the exception which we are considering, excluding evidence of other crimes, and showed the purpose and intent, in common language, to "get" the Hunter family.

In *People* v. *Cook,* 148 Cal. 334 [83 Pac. 43], where the defendant was on trial for the murder of one Kreiger, and claimed that the act was committed in defense of the honor of his daughter, the court permitted the prosecution to prove that the defendant had had incestuous relations with his

daughter, and that defendant feared Kreiger knew of such acts or would succeed in winning the favor of the girl and discover his criminal relations with her. Thus, a direct motive for the murder is shown, and, as stated by the court, evidence which is relevant to any material fact in issue in a criminal case cannot be excluded because it may prejudice the defendant by proving him guilty of some other crime than the one for which he is on trial. (Citing *People* v. *Walters*, 91 Cal. 141 [32 Pac. 864]; *People* v. *Lane*, 101 Cal. 513 [36 Pac. 16]; *People* v. *Wilson*, 117 Cal. 688 [49 Pac. 1054]; *People* v. *Walliere*, 133 Cal. 576 [56 Pac. 433]; *People* v. *Brown*, 130 Cal. 594 [62 Pac. 1072].) The court in that case also further said: ''But in order to render evidence of this character admissible, it must have a direct tendency, in view of the surrounding circumstances, to prove the motive or intent or other material fact, and whether it is relevant or not is a question for the court, and in several instances this court has reversed convictions for the admission of evidence of such distinct offenses, upon the ground that such evidence had no tendency to prove the charge made in the information.'' (Citing *People* v. *Lane*, 100 Cal. 379 [34 Pac. 856]; *People* v. *Wright*, 144 Cal. 165 [77 Pac. 877]).

In *People* v. *Argentos*, 156 Cal. 720 [106 Pac. 65], where the defendant was on trial charged with the crime of murder, the prosecution was allowed to prove certain facts showing that the deceased was upon the bond of the defendant, the defendant being out on bail; that the deceased was about to withdraw from the bond of the defendant and the defendant started with the deceased to show him certain claimed mining property in order to induce the deceased not to withdraw from the defendant's bond. These claims, it appears, the defendant had agreed to convey to the deceased. No such claims existed. Evidence of these facts were admitted in connection with the testimony showing that the deceased and the defendant had started to where the alleged mining property was said to be located. All showing motive. The statement of facts contained in the opinion showed that all the acts admitted in evidence were related and led up to the commission of the main offense for which the defendant was being tried.

In *People* v. *King*, 23 Cal. App. 259 [137 Pac. 1076], the principal case relied upon by the respondent, it appears that the defendant was on trial for embezzlement; that during the course of the trial a witness named Davila was permitted to testify that the defendant, as his agent, in the latter part of the year 1913, had misappropriated and embezzled a certain sum of money; and, further, that the prosecution was permitted to show that in 1908, several years prior to the time of the commission of the offense charged for which the defendant was being tried, he had rented a horse and wagon which he failed to return to the owner, and that as a consequence the defendant was arrested and subsequently pleaded guilty to a charge of misdemeanor and embezzlement, and also permitted a witness named Faria to testify in effect that about a year previous to the trial then being had, the defendant had embezzled the sum of three dollars which had been entrusted to him by the witness for the purpose of making the first payment on the purchase price of a horse. According to the opinion of the appellate court, all the testimony just referred to was admitted by the trial court upon the theory that it tended to prove prior offenses similar in character to the crime charged in the information and for which the defendant was being tried, and was therefore admissible for the purpose of showing the guilty intent of the defendant in his dealings with the complaining witness. The appellate court then said: ''We are further satisfied that the trial court erred, to the prejudice of the defendant, in admitting the testimony complained of.'' The opinion of the appellate court in that case contains the following language, upon which the respondent places much stress in this case: ''It is a well-settled rule of evidence that proof of an offense, distinct from and wholly disconnected with the particular crime charged against a defendant, is not admissible in evidence. Unquestionably this general rule is subject to certain well-defined exceptions, one of which is that evidence of the commission of similar offenses, although separate and isolated from the crime charged, is admissible for the purpose of showing a guilty intent whenever, in any given case, the existence of such intent is material and either disputed or doubtful. For instance, in a case where the defendant admits the doing of an act in the information, but defends

upon the ground that such act is free from felonious intent, proof of the commission of precisely similar acts, even though they be independent and disconnected and were committed either before or after the commission of the crime charged, is relevant and competent for the purpose of showing a guilty intent. Such evidence is admissible as an exception to the general rule upon the theory that if it be shown that a defendant has been repeatedly guilty of similar offenses, it may be reasonably and logically inferred that the act charged against him in the information was accomplished with felonious intent." The language of the court here referred to, in order to be an accurate statement of the law, should have added thereto the following, which we quote from 8 California Jurisprudence, page 64, supported by abundant authority: "Furthermore, in order to render the evidence admissible, it must have a direct tendency, in view of the surrounding circumstances, to prove the motive or intent or other material fact. It is true that it is not necessary that the collateral evidence, whether prior or subsequent, should conclusively prove the guilt of the accused of the offense for the commission of which he is being tried, in order to render it admissible in evidence; but as evidence of another distinct offense manifestly tends to his prejudice, there ought to be some clear connection between the two offenses by which it may be logically inferred that if guilty of one, he is of the other. For example, the shooting of one person by another cannot be proved to show the intent with which the latter shot a third person at a different time, and for a different cause, unless it is also established that the two shootings were so connected in time and place and circumstances as to make them part of one common plan or design. (For example.) Upon a prosecution for larceny or burglary, with intent to steal, evidence that the defendant had, at another time, stolen other property, is inadmissible to show intent."

In *People* v. *Byrnes,* 27 Cal. App. 79 [148 Pac. 944], the rules which we have above stated covering the admission of such testimony were set forth, and the cause was reversed because of the admission of testimony tending to show the commission of similar offenses not connected with the offense for which the defendant was on trial.

 Giving the exception to the rule excluding evidence of other offenses the broadest possible application, it nevertheless remains the law, as declared by all the decisions, that such testimony must have some relation to or bear upon some fact necessary to be established by the prosecution in order to warrant a conviction of the defendant upon the immediate charge pending before the court and upon which he is being tried. It is not sufficient that the defendant has, at some previous time, committed a similar offense. Measured by the rule set forth in the California cases relied upon by the respondent, we do not very well see how it can be logically concluded that the defendant on the night of the 24th of December, 1926, assaulted his wife with a malicious and wilful intent to take her life simply because, at a period some seven or eight years antedating December 24, 1926, the defendant, after being struck upon the head with a chair, turned and hit his stepdaughter in the face.

 Nor do we very well perceive how it may be reasonably concluded that the defendant, on the night of the 24th of December, 1926, maliciously and wilfully intended to kill his wife because several years prior to his marriage with his then wife he sought to have carnal relations with another woman who had previously thereto illegally assumed with the defendant the relation of wife. That such testimony may establish the all-around bad character of the defendant is clearly apparent, but that it leads or tends to lead to the conclusion that the defendant had any malicious intent to murder his legitimate wife, whom he had married some years after these events, requires at least a higher degree of casuistry than has been accepted by any of the decisions of this country to which our attention has been called. The theory that the defendant intended to dislocate his wife's neck, because, at a time seven or eight years previous thereto, he slapped a girl in the face, requires only to be stated in bald language in order to carry its own refutation. Nor does it bear in the least upon the question whether the dislocation of the wife's neck, on the night of the 24th of December, 1926, was or was not accidental in any particular whatever. The same is true of the alleged criminal assault upon another woman some four years previously. It seems scarcely necessary

to cite authorities to show the inadmissibility of such testimony. However, we will review a few cases directly in point establishing the rule to the contrary. The most recent case upon this question is that of *People* v. *Anthony,* 185 Cal. 152 [196 Pac. 47], where the defendant was on trial charged with the offense of lewd and lascivious conduct upon the body of a female child under the age of fourteen years. A reversal of this case was ordered because the prosecuting attorney repeatedly asked the defendant if he had not had illicit intercourse with other young girls. Here, no testimony as to such acts was in question, but simply the improper questioning of the defendant as to such occurrences was held sufficient, in an evenly balanced case, to compel a reversal of the judgment and the ordering of a new trial.

In the case of *People* v. *Glass,* 158 Cal. 650 [112 Pac. 281], the questions here presented were considered at length. The defendant was on trial for bribery. Testimony as to other similar, but disconnected offenses, was admitted, and the cause was ordered reversed on account of the error of the court in relation thereto.

In *People* v. *Cook,* 148 Cal. 334 [83 Pac. 43], the rule that we have stated that there must be some connection between the two offenses in order to permit testimony as to the former is thus stated. We quote from the syllabus: "When some distinct offense is so connected with the crime charged in the indictment that proof of the former, in connection with other evidence, would sustain a probable inference of guilt as to the latter, such distinct offense may be proved to show a motive on the part of the defendant to commit the crime charged, or the intent with which an equivocal act was done." Many cases are cited in the opinion in the Cook case, all holding substantially as we have stated.

In *People* v. *Carpenter,* 136 Cal. 391 [68 Pac. 1027], the defendant was on trial charged with subornation of perjury. The prosecution was permitted, over the objections of the defendant, to introduce testimony tending to prove that the defendant, prior to the trial of the cause referred to, was guilty of the crime of advising the same witness to conceal himself for the purpose of avoiding the service of a subpoena, and thus of persuading him from attending upon the trial. The court held that this was error, and

said: "Nothing is better settled or more rational than that an indictment for one crime cannot be supported by proof of another." For this error the cause was reversed.

In the case of *People* v. *Elliott,* 119 Cal. 593 [51 Pac. 953], where the defendant was on trial upon an information on the charge that she wilfully, unlawfully, etc., induced an unmarried female into a bawdy-house, testimony of three other young girls was allowed to be introduced by the prosecution, over the objection of the defendant, that the defendant had asked each of them to go to her house for illicit purposes. This was held error, necessitating a reversal of the judgment. In the case just cited the alleged offenses were identical in character but not otherwise connected or bearing upon each other.

In *People* v. *Stewart,* 85 Cal. 174 [24 Pac. 722], the defendant was on trial charged with the crime of assault with intent to commit rape. Testimony as to lewd conduct by the defendant with other girls was admitted, over the objection of the defendant. The court held this action reversible error, and said: "The admission of this evidence was clearly reversible error. There is no general rule more firmly settled than that the prosecution cannot prove the commission by defendant of other offenses for the purpose of increasing the likelihood that he committed the particular offense with which he is charged." Here it was necessary to make out the fact of intent before the defendant could be convicted of the offense with which he was charged, and the court squarely held that testimony as to other like offenses could not be admitted under the rule because the separate offenses had no relation to or bearing upon each other. Had the different assaults been made upon the same person, then the exception would apply and testimony in relation thereto would be admissible. Likewise, where the offenses are committed in the carrying out of some connected plan or scheme, such testimony, the authorities hold, may be admitted. Without further citation of authorities we may here state that in a lengthy note appended to the case of *People* v. *Molineux,* 168 N. Y. 264 [61 N. E. 286], as reported in 62 Lawyers' Reports Annotated, beginning on page 193, the authorities, dealing with the questions we are here considering are collected, and the rules which we have set forth clearly established.

■ The jury found the defendant guilty of involuntary manslaughter, which offense is described as follows: "The killing of a human being, without malice, in the commission of an unlawful act not amounting to a felony; or, in the commission of a legal act which might produce death, in an unlawful manner, or without due caution and circumspection." Thus, the element of malicious intent has been excluded from this case by the verdict of the jury, and the question they had to decide under the evidence as measured by the offense of which the defendant was found guilty was whether the defendant and his wife had been engaged in a scuffle after having imbibed too freely of intoxicating liquors, or to put it in other words, engaged in a drunken scuffle, or did the defendant commit what in fact and in law would constitute an assault upon the person of his wife, or was he engaged in some lawful act which might produce death in an unlawful manner, or was he acting without due caution and circumspection. Under such circumstances, was the inadmissible testimony to which we have referred prejudicial? We think this question really answers itself. To introduce to the jury testimony that the defendant was a rough, violent, uncouth, hard-handed man was very well calculated to induce the jury to believe that such a person would at all times act without due caution or circumspection, or without full appreciation of the consequences which might ensue. That conviction would more readily occur if the jury had before it a picture of the rough, uncouth conduct of the defendant previous to the commission of the offense upon which he was being tried, as well as the degraded character which the testimony all tended to establish, seems to us beyond controversy.

We do not need to review the cases or attempt any further explanation or interpretation of the meaning and intent of section 4½ of article VI of the constitution of this state. That is fully covered in the case of *People* v. *Adams*, 76 Cal. App. 178 [244 Pac. 106]. Omitting the objectionable testimony, this case does not present one where we can say that the jury could not have reasonably found a verdict other than the one at which they arrived. Under the most favorable circumstances the admission of such testimony tends to bring about the conviction of a defendant on the ground that such a person needs a good lesson, even though

the testimony does not otherwise legally justify conviction upon the charge for which he is being tried.

█ Appellant also urges that the court erred in permitting the cross-examination of the defendant as to his former marriage with the woman to whom we have referred in this opinion as having had a husband living at the time of her marriage to the defendant. As the cause must go back for retrial for other reasons, it is not necessary to go into this question at length and decide whether the contention of the appellant is or is not well taken as to such error being sufficient ground for reversal. So far as we have been able to ascertain, the cross-examination of the defendant referred to was upon a subject not touched upon in the direct examination of the defendant, or having any relation thereto or bearing upon the same, and the objections of the defendant should have been sustained.

The recent case of *People* v. *Frank,* 75 Cal. App. 74 [241 Pac. 924], deals with the question of the court's examination of a defendant as permitted by section 1323 of the Penal Code, and the reasoning of the court in that case and the decisions cited sufficiently establish that the objections of the appellant should have been sustained. As conducted by the prosecution, the examination sought to show bigamous relations of the defendant and also of the woman passing as his wife. The record is utterly devoid of any testimony from which it could be concluded that there was any thought in the mind of the defendant of making away with his legitimate wife on the night of the 24th of December, 1926, on account of any bigamous or other illicit relations with the woman to whom we have referred. Such being the case, the testimony should have been excluded.

It is further urged that the district attorney was guilty of misconduct in his argument before the jury, but as such argument had relation principally to the testimony which we have held should have been excluded, it is not probable that a repetition of such argument will occur, and therefore need not be dwelt upon herein.

The order and judgment of the trial court are reversed and the cause remanded for a new trial.

Burroughs, J., *pro tem.,* and Finch, P. J., concurred.