[Crim. No. 1151. Third Appellate District.—June 1, 1931.]

THE PEOPLE, Respondent, v. J. STEFINI, Appellant.

P. A. McCarran and J. T. Rutherford for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

MR. JUSTICE Pro Tem. BORROUGHS Delivered the Opinion of the Court.—The defendant was accused by an information filed in the Superior Court of Nevada County of the crime of assault with a deadly weapon with intent to commit murder alleged to have been committed on or about the ninth day of July, 1930, upon the person of one Bob Pini. The defendant entered a plea of not guilty and upon the issue thus raised the cause was tried with a jury, which returned a verdict of guilty of the crime of assault with a deadly weapon. He thereupon made a motion for a new trial, which was denied and the court thereupon sentenced him to imprisonment in the state prison at San Quentin for the term provided by law. From the judgment and the order denying his motion for a new trial the defendant has appealed.

The only point relied upon for a reversal of the judgment is the admission of certain evidence, which it is claimed was prejudicial to the defendant. The defendant offered himself as a witness in his own behalf. On cross-examination, and without any objection, he was asked for the first time what business he had been following for the period of about two years prior to July 9, 1930, the date of the assault, to which he replied that he had no business.

In rebuttal, a witness named Maggie Degiovanni was asked, "What was the business of Mr. Stefini in the month of July, 1930?" Over the objection of the defendant the witness answered, "His business was to run a still." A motion was then made to strike out the answer, which motion was denied and it is now claimed by appellant that, as the business of running a "still" is a crime and there is no causal connection between the crime of "operating a still" and the crime of "assault with a deadly weapon with intent to commit murder", such evidence was bound to prejudice the defendant in the minds of the jury.

A careful reading of the evidence reveals that there was no connection whatever between the two offenses. In *People* v. *Glass,* 158 Cal. 650 [112 Pac. 281, 287], it is said:

"As a general rule evidence of the commission of a different offense cannot be admitted in proof of the offense for which the defendant is on trial and this rule excludes all evidence of collateral facts or matters which are incapable of offering a reasonable presumption of logical inference as to the principal fact or matter in dispute." It is also said in the case last cited:

"To admit evidence of collateral matters that do not tend to prove either the issue, the motive, guilty knowledge, or the probability of a theory, or the identity of the defendant, would be but to oppress the defendant by trying him on a case as to which he has not been notified, and for the trial of which he is not prepared." It is also said in that case:

"That evidence as to offenses, other than the one for which the defendant is being tried, may be given to show a motive for the commission of the crime is not doubted. But the motive for the commission of the crime charged must grow out of the collateral crime."

Upon this subject see, also, the cases of *People* v. *Coan,* 85 Cal. App. 580 [259 Pac. 998], and *People* v. *Washburn,* 104 Cal. App. 662, 670 [286 Pac. 711].

From the foregoing authorities we are satisfied that the admission of the foregoing evidence was erroneous, nor do we believe that the fact that on cross-examination defendant was asked by the prosecution as to his business and his answer that he had none justified the court, in the face of the objection, in admitting the evidence. The

admission of the above evidence being error, the question now presents itself, was the error prejudicial to the rights of the defendant? There is no claim made by the defendant that the evidence was insufficient to justify the verdict. Section 4½ of article VI of the Constitution of the state provides that no judgment shall be set aside, or new trial granted, in any case, on the ground of error in the admission or rejection of evidence, unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.

Under the above section it has been held that it is the duty of the appellate court to review conflicting evidence for the purpose of ascertaining whether or not error "has resulted in a miscarriage of justice", as an injury is no longer presumed from error, it must be affirmatively shown. (*Vallejo & Northern R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545 [147 Pac. 238]; *People* v. *Mazzurco,* 49 Cal. App. 275 [193 Pac. 164]; *People* v. *Alba,* 52 Cal. App. 603 [199 Pac. 894].) Errors will not be ground for reversal where the evidence is sharply conflicting. (*People* v. *Stephens,* 29 Cal. App. 616 [157 Pac. 570, 572].) Where the guilt of the defendant is clear errors will be disregarded. (*People* v. *Level,* 27 Cal. App. 257 [149 Pac. 772].) Since the adoption of this section injury is no longer presumed from error, but must appear affirmatively upon an examination of the record or from the intrinsic nature of the error itself. (*Cuddahy* v. *Gragg,* 46 Cal. App. 578 [189 Pac. 721].)

A brief epitome of the evidence in this case is as follows: The complaining witness Bob Pini testified that about midnight of the night of July 9, 1930, he was walking towards his home at Maggie Degiovanni's residence in Truckee. He saw the defendant Stefini come from behind a wood-pile, cross the street and come down the sidewalk toward the residence of Mrs. Degiovanni and stop at the front gate and wait for Pini, when, according to the testimony of Pini, the defendant said: " 'Hello' to me, so I said, 'hello' to him, he said, 'you here' and I said 'yes'. He said, 'you know what you are.' I said, 'No', so he shot me, right in my chest, . . . well, he shot once in my chest, and I had my hand in my pocket; I took my hand out of my pocket

and I started to wrestling with him to take the gun off, and when I took the gun off another shot goes off. . . . I got the gun and I started to beat him up in the head. I grabbed the gun and hit him with it. . . . I hit him two or three times, and I got blind with the blood and couldn't do any more, and turned him loose.''

Maggie Degiovanni testified that she heard two shots, one shortly after the other and heard someone call for help. She went out on her front porch and saw two men struggling. She asked what was the matter and Bob Pini said, ''He shot me,'' and that Stefini made no reply. When the witness reached the sidewalk, Stefini was lying on the sidewalk on his back and Pini was kneeling over him. The witness helped Pini into the house. Pini gave her the gun. After she had taken Pini into the house, she went back to the sidewalk and Stefini had disappeared. This witness also testified of threats made by the defendant to take Pini's life and that he would ''get him''. She also testified that Stefini objected to Pini being a boarder and roomer at her home.

Mrs. Charles Cabona testified that she arrived at Mrs. Degiovanni's home right after the shooting, she lived near there and heard two shots, she was home in bed at the time she heard them. When she reached the sidewalk, she saw Pini and Stefini wrestling on the sidewalk. She recognized Pini and called his name. He said, ''He shot me.'' The witness telephoned for the doctor and then went over to Mrs. Degiovanni's house and Stefini was not there. One of the bullets that was fired went through the window in Mrs. Cabona's house. The room in the house where the window was broken was occupied by a man and his wife and Mrs. Cabona did not know about the bullet going through the window until the next day. She heard Stefini call for help, but it was after the shots were fired. The revolver belonged to Stefini and when Pini handed it over to Mrs. Degiovanni it had three loaded and two discharged cartridges in the cylinder. Search was made for Stefini, but he was not found and the next afternoon about 5 o'clock he surrendered himself to the sheriff.

In his own behalf the defendant testified that on the night of July 9, 1930, he was at home before he met Bob Pini, that he left home about midnight, that he first saw

Pini about fifteen feet from Mrs. Degiovanni's gate. He further testified that when he reached the gate of Mrs. Degiovanni's home, "I said, 'Hello, Pini', he said, 'hello', I said, 'I would like to talk with you,' and he says, 'All right' and I say, 'I got pretty good relation down there, my second cousin, and she has three beautiful girls and it is too bad to let them go around that place up there because it is too close, that place is too close to the red light land.' . . . Then he says, 'I will do what I please' and then he started to hit me on the mouth and eye pretty bad and I am an old man and am crippled but I try to protect myself and I had a gun in my pocket. I pulled out the gun and shot him, and Pini grabbed my gun and I try to hold it but I couldn't hold it and pretty soon he got it because he is too strong and he got it in his hand and got it by the barrel. He hit me on the head with it so hard and hit me another time and one bullet go off. . . . He hit me twice before I pulled the gun." The witness further testified that he carried the gun because on the 16th of June he came home about 2 o'clock in the morning and was held up by masked men and they robbed him of $6.50. He further testified that he had never had any trouble with Pini nor did he tell the officers about the hold-up. He also testified that Pini's place was pretty close up to the red light places and he had seen Mrs. Degiovanni and her three children at Pini's place.

In rebuttal, George R. Carter, sheriff of Nevada County, testified that the morning following the arrest of Stefini, at the branch county jail at Truckee, the defendant told him that it was after he (the defendant) had shot Pini that Pini beat him up.

There is other evidence in the record tending to support the contention of both prosecution and the defense, but the foregoing is a substantial part of the evidence.

We think it is clear that the evidence was ample to sustain the verdict of the jury and that the admission of the evidence complained of and which we have held to be error is not sufficient to justify the reversal of the judgment, and that there has not been a miscarriage of justice within the meaning of section 4½ of article VI of the Constitution of the state of California.

The order denying the motion for a new trial and the judgment are affirmed.